**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

PARAMOUNT PICTURES
CORPORATION; WARNER BROS.
ENTERTAINMENT INC.; TWENTIETH
CENTURY FOX FILM CORPORATION;
COLUMBIA PICTURES INDUSTRIES,
INC.; UNIVERSAL CITY STUDIOS LLC;
UNIVERSAL STUDIOS HOME
ENTERTAINMENT LLC; and DISNEY
ENTERPRISES, INC.,

                    Plaintiffs,

    v.

JOHN DOES, JANE DOES, and/or XYZ
CORPORATIONS d/b/a MOVIETUBE; and
JOHN DOES, JANE DOES, and/or XYZ
CORPORATIONS 2-100,

                    Defendants.

CIVIL ACTION NO. 15-CV-5819 (PAC)

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.......................................................................................................2

      A.    Plaintiffs' Businesses, Copyrighted Works And Intellectual Property.................. 2

      B.    Defendants' Infringing Activities ........................................................................ 3

            1.    Defendants Commonly Own And Control The MovieTube Websites.................................................................................................. 6

            2.    Defendants' Use Of False Identities And Attempts To Avoid Detection And Enforcement .................................................................. 7

ARGUMENT ..............................................................................................................................8

I.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS.................................................................8

      A.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims....................... 8

            1.    Plaintiffs Are Likely To Prevail On Their Direct Copyright Infringement Claim................................................................................. 8

            2.    Plaintiffs Are Likely To Prevail On Their Contributory Copyright Infringement Claim................................................................................. 11

            3.    Plaintiffs Are Likely To Prevail On Their Trademark Infringement Claims ................................................................................................... 14

      B.    Plaintiffs Have No Adequate Remedy At Law And Defendants' Public Performance, Distribution And Display Of Infringing Copies Irreparably Harms Plaintiffs ............................................................................................... 16

      C.    The Balance of Hardships and Public Interest Favor an Injunction .................... 19

II.    THE PRELIMINARY INJUNCTION ORDER SHOULD DIRECT SERVICE PROVIDERS TO CEASE PROVIDING SERVICES TO DEFENDANTS....................20

III.    PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS.......................................................................23

IV.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY...................................24

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adolph Coors Co. v. A. Genderson & Sons, Inc.*,
    486 F. Supp. 131 (D. Colo. 1980)...................................................................15

*Advanced Access Content System Licensing Adminstrator, LLC v. Shen*,
    No. 14-cv-1112 (VSB) (S.D.N.Y. Mar. 4, 2014)........................................22

*ALS Scan, Inc. v. RemarQ Cmtys., Inc.*,
    239 F.3d 619 (4th Cir. 2001) .......................................................................16

*Am. Broad. Companies, Inc. v. Aereo, Inc.*,
    134 S. Ct. 2498, 189 L. Ed. 2d 476 (2014) ..............................................9, 10

*Animale Grp. Inc. v. Sunny's Perfume Inc.*,
    256 F. App'x 707 (5th Cir. 2007) ................................................................23

*Apple Computer, Inc. v. Franklin Computer Corp.*,
    714 F.2d 1240 (3d Cir. 1983)......................................................................19

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010)........................................................................11

*Arista Records, LLC v. Tkach*,
    No. 15-cv-3701 (AKN) (S.D.N.Y. June 3, 2015) .....................................22

*Belstaff Group SA v. Doe*,
    No. 15-cv-2242 (S.D.N.Y. Apr. 8, 2015) ..................................................21

*Broad. Music, Inc. v. Hearst/ABC Viacom Entm't Servs.*,
    746 F. Supp. 320 (S.D.N.Y. 1990)........................................................10, 12

*Capitol Records, LLC v. BlueBeat, Inc.*,
    765 F. Supp. 2d 1198 (C.D. Cal. 2010) ......................................................11

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) .....................................................................12

*Corning Glass Works v. Jeannette Glass Co.*,
    308 F. Supp. 1321 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970)...............................19

*Datatech Enters. LLC v. FF Magnat Ltd.*,
    No. C 12-04500, 2012 U.S. Dist. LEXIS 131711 (N.D. Cal. Sept. 14, 2012) ...........20, 23, 24

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
    806 F.2d 392 (2d Cir. 1986)................................................................15

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991)........................................................................8

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
    696 F. Supp. 2d 368 (S.D.N.Y. 2010).................................................15

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971).......................................................11, 13

*Getty Images (U.S.), Inc. v. Microsoft Corp.*,
    No. 14CV7114 DLC, 2014 WL 6633032 (S.D.N.Y. Nov. 24, 2014) ....................10

*Gucci Am., Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014)...............................................................23

*Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*,
    780 F.2d 189 (2d Cir. 1985)................................................................8

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) .............................................................24

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
    51 F.3d 982 (11th Cir. 1995) .........................................................20, 23

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*,
    378 F. Supp. 2d 448 (S.D.N.Y. 2005).................................................14

*Matthew Bender & Co. v. W. Pub. Co.*,
    158 F.3d 693 (2d Cir. 1998)...............................................................11

*Maverick Recording Co. v. Goldshteyn*,
    2006 WL 2166870 (E.D.N.Y. July 31, 2006) ...........................................11

*Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*,
    312 F.3d 94 (2d Cir. 2002)................................................................16

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)......................................................................19

*Microsoft Corp. v. Jun Yan*,
    No. 10-cv-00162, 2010 U.S. Dist. LEXIS 14933 (D. Conn. Feb. 18, 2010)..........23

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010)..............................................18, 19

*Nat'l Ass'n of Broads. v. Copyright Royalty Tribunal*,
    809 F.2d 172 (2d Cir. 1986)..........................................................................10

*The Nat'l Football League v. Chen*,
    No. 11-Civ-0344 (WHP) (S.D.N.Y. Jan. 19, 2011)................................................22

*NFL v. PrimeTime 24 Joint Venture*,
    211 F.3d 10 (2d Cir. 2000).......................................................................9, 10

*The North Face Apparel Corp. v. Fujian Sharing Import & Export Ltd.*,
    10-Civ-1630 (AKH) (S.D.N.Y.) ..................................................................20, 21

*Omega Importing Corp. v. Petri-Kine Camera Co.*,
    451 F.2d 1190 (2d Cir. 1971)........................................................................17

*Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*,
    816 F.2d 68 (2d Cir. 1987)...........................................................................15

*Otokoyama Co. v. Wine of Japan Import, Inc.*,
    175 F.3d 266 (2d Cir. 1999).........................................................................14

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................................13

*Playboy Enters., Inc. v. Frena*,
    839 F. Supp. 1552 (M.D. Fla. 1993) ..............................................................16

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*,
    754 F.2d 91 (2d Cir. 1985)..........................................................................18

*Reebok Int'l Ltd. v. Marnatech Enter.*,
    737 F. Supp. 1521 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992) ..............................24

*Reebok Int'l Ltd. v. Marnatech Enter.*,
    970 F.2d 552 (9th Cir. 1992) .......................................................................20

*Richemont Int'l SA v. Chen*,
    No. 12-cv-6689 (S.D.N.Y. Sept. 4, 2012)............................................................21

*Richemont Int'l SA v. Xiao*,
    No. 13-cv-9071 (S.D.N.Y. Dec. 23, 2013) ..........................................................21

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).................................................................8, 16, 17, 18

*Shell Oil Co. v. Commercial Petroleum, Inc.*,
    928 F.2d 104 (4th Cir. 1991) .......................................................................15

*Showtime Networks, Inc. v. Doe 1,*
    No. 15-cv-03147 (April 30, 2015) .................................................................22, 23

*Tecnimed SRL v. Kidz-Med, Inc.,*
    763 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................................................................18

*Twentieth Century Fox Film Corp. v. Mow Trading Corp.,*
    749 F. Supp. 473 (S.D.N.Y. 1990) ..........................................................................24

*U.S. Polo Assoc. v. PRL USA Holdings, Inc.,*
    800 F. Supp. 2d 515 (S.D.N.Y. 2011) ....................................................................18

*Universal Studios v. Corley,*
    273 F.3d 429 (2d Cir. 2001) ...................................................................................10

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012) .....................................................................................12

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,*
    192 F. Supp. 2d 321 (D.N.J. 2002), *aff'd,* 342 F.3d 191 (3d Cir. 2003) ......................9, 10, 15

*Warner Bros. Entm't, Inc. v. WTV Sys.,*
    824 F. Supp. 2d 1003 (C.D. Cal. 2011) ...............................................................9, 17

*Warner Bros. Ent., Inc. v. Doe,*
    No. 14-cv-3492 (KPF) (S.D.N.Y. May 29, 2014) ..................................................22

*WPIX, Inc. v. ivi, Inc.,*
    691 F.3d 275 (2d Cir. 2012) ...........................................................................9, 17, 19

**Statutes**

15 U.S.C.
    § 1114(1) ................................................................................................................14
    § 1114(1)(a) ..............................................................................................................1
    § 1116(a) ................................................................................................................20
    § 1117 .....................................................................................................................23
    § 1125 .....................................................................................................................20
    § 1125(a) ...................................................................................................................1

17 U.S.C.
    § 106(3)–(5) ...........................................................................................................8, 9
    § 106(4) ..................................................................................................................10
    § 106(5) ..................................................................................................................10
    § 501 ...................................................................................................................1, 8, 9
    § 502 .......................................................................................................................20
    § 504(b) ..................................................................................................................23

28 U.S.C.
  § 1651....................................................................................................................................20

**Rules**

Fed. R. Civ. P. 65(d)(2)........................................................................................................20

Plaintiffs submit this Memorandum of Law in support of their motion for preliminary injunction against Defendants for copyright infringement under the Copyright Act, 17 U.S.C. § 501, *et seq.*; trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a); and unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

<u>**PRELIMINARY STATEMENT**</u>

Defendants own and operate a ring of at least twenty-nine (29) interconnected video-on-demand websites under the MovieTube brand name and  logo (the "MovieTube Websites"). The MovieTube Websites all bear similar interfaces and attempt to mimic legitimate commercial sources of digitally-streamed video entertainment content but instead stream, and in some cases allow downloading of, unauthorized copies of Plaintiffs' copyrighted works (the "Infringing Copies").



Through the MovieTube Websites, Defendants profit handsomely by knowingly and willfully violating Plaintiffs' exclusive rights to display, publicly perform and distribute their copyrighted works.  By streaming, providing copies of and embedding links to infringing content stored elsewhere on the Internet, the MovieTube Websites offer extensive libraries of newly-released and popular copyrighted content without: (i) incurring licensing costs to acquire the content legitimately, (ii) hosting costs to store content or (iii) bandwidth costs to deliver the content. Using an ad-based revenue model, Defendants aggressively market the MovieTube Websites through social media and claim to have the "largest movie database, fastest streaming speed, and it's 100% free!"  Defendants, in a recent single month, attracted over 81 million visits to the MovieTube Websites, including almost 61 million visits from users in the United States.

Defendants profit from what they admit is illegal activity within the United States. Defendants boast that they "do not need to respect US laws" because "they are not a US company."  To maximize their illegal scheme and to guard against prosecution, Defendants take steps to conceal their identity which includes, but is not limited to, the provision of false WHOIS registration information for the domain names of MovieTube Websites, the use of private and proxy registration services to conceal the ownership of MovieTube Websites' domains, and the failure to list any physical contact information on the MovieTube Websites.

Defendants' continued flagrant and unauthorized exploitation of Plaintiffs' copyrighted works is causing—and without an injunction as requested herein, will continue to cause—irreparable harm to Plaintiffs.

## FACTUAL BACKGROUND

### A.    Plaintiffs' Businesses, Copyrighted Works And Intellectual Property

Plaintiffs, directly or through their affiliates, are among the leading motion picture and/or television studios responsible for the creation and distribution of some of the world's most

popular motion picture and television entertainment.[1]  Plaintiffs own and/or control the
copyrights and/or the relevant exclusive rights under United States copyright law ("Plaintiffs'
Copyrights") in numerous motion pictures and/or television program works ("Plaintiffs'
Works").[2]  Plaintiffs, either on their own or in conjunction with their affiliates, have the
exclusive rights in the United States to, among other things, publicly perform, publicly display
and/or distribute Plaintiffs' Works, including through digital streaming services, cable and
satellite television providers, and pre-recorded DVDs and Blu-ray discs.[3]

Plaintiffs are also the proprietors of some of the most well-known and well-regarded
brands in the world including, but not limited to, PARAMOUNT®, WARNER BROS®,
TWENTIETH CENTURY-FOX®, COLUMBIA PICTURES®, UNIVERSAL®, and WALT
DISNEY® (collectively with other related word and design marks, "Plaintiffs' Marks"), which
have long been used by Plaintiffs in conjunction with the distribution of Plaintiffs' Works.[4]
Plaintiffs' Marks are widely promoted, both in the United States and throughout the world and,
as a result, consumers, potential consumers and members of the general public alike recognize
that copies of Plaintiffs' Works bearing Plaintiffs' Marks originate exclusively with Plaintiffs.[5]

### B.    Defendants' Infringing Activities

Defendants, through the MovieTube Websites, stream Infringing Copies of Plaintiffs'

---

[1] Declaration of Kevin Suh, dated July 23, 2015 ("Suh Decl.") ¶ 3; Declaration of David Phillip Kaplan, dated July 14, 2015 ("Kaplan Decl.") ¶ 4; Declaration of Daniel Kim, dated July 16, 2015 ("Kim Decl.") ¶ 3; Declaration of Michael Stanton, dated July 16, 2015 ("Stanton Decl.") ¶ 4; Declaration of Karen Garver, dated July 21, 2015 ("Garver Decl.") ¶ 4; Declaration of Marsha L. Reed, dated July 15, 2015 ("Reed Decl.") ¶ 3.
[2] Suh Decl. ¶ 4, Ex. A; Kaplan Decl. ¶ 5, Ex. A; Kim Decl. ¶ 4, Ex. A; Stanton Decl. ¶ 5, Ex. A; Garver Decl. ¶ 5, Ex. A; Reed Decl. ¶ 4, Ex. A.
[3] Suh Decl. ¶ 5; Kaplan Decl. ¶ 6; Kim Decl. ¶ 4; Stanton Decl. ¶ 6; Garver Decl. ¶ 6; Reed Decl. ¶ 5.
[4] Suh Decl. ¶¶ 6-8, Ex. B; Kaplan Decl. ¶¶ 7-9, Ex. B; Kim Decl. ¶¶ 5-7, Ex. B; Stanton Decl. ¶¶ 7-9, Ex. B; Garver Decl. ¶¶ 7-9, Ex. B; Reed Decl. ¶¶ 6-8, Ex. B. Plaintiffs' Marks are the subject of numerous valid and subsisting United States registrations, many of which have become incontestable. *Id.*
[5] Suh Decl. ¶¶ 9-10; Kaplan Decl. ¶¶ 10-11; Kim Decl. ¶¶ 8-9; Stanton Decl. ¶¶ 10-11; Garver Decl. ¶¶ 10-11; Reed Decl. ¶¶ 9-10.

Works.[6]  Users of the MovieTube Websites can stream these Infringing Copies using either (i) video player software supplied by and built into the MovieTube Websites; and/or (ii) frames of third-party video players.[7]  Either way, users can watch Infringing Copies without leaving the MovieTube Websites.[8]  The MovieTube Websites also allow users, in some instances, to download Infringing Copies by clicking on a selection from a menu built into the video player software.[9]  Defendants select, organize and promote the content streamed via the MovieTube Websites and do not allow users to make additions or changes to the websites.[10]

Defendants advertise and market their offerings of Infringing Copies, including by curating browsable categories and indexes of genres (*e.g.*, comedy, action, drama, etc.).[11]  Each of the Infringing Copies is accompanied by the corresponding work's name, principal cast and director, plot synopsis, IMDB rating, a promotional poster or "key art", and/or a playable preview video.[12]

Defendants generate revenues through the display of digital advertisements[13] served by advertising service providers AdCash, Propeller Ads Media, MGID and Matomy Media Group.[14] To increase advertising revenues, Defendants drive visitor traffic to the MovieTube Websites through various means including: (i) promoting the MovieTube Websites and Infringing Copies on their social media accounts such as Facebook and Twitter ("Defendants' Social Media Accounts"); (ii) embedding Facebook user comments on the MovieTube Websites and within the content; and (iii) promoting the MovieTube Websites through the use of meta-tags and keywords

---

[6] Alemi Decl. ¶ 6.
[7] *Id.* ¶ 8-9.
[8] *Id.* ¶ 10.
[9] *Id.* ¶¶ 11, 16.
[10] *Id.* ¶¶ 6, 13.
[11] *Id.* ¶ 14.
[12] *Id.* ¶ 6.
[13] The digital advertisements are either pop-up advertisements that open in a new window or tab; or they are frame or display advertisements that appear on the website itself. *Id.* at 7, n.2.
[14] *Id.* ¶ 18, Ex. A.

designed to maximize the MovieTube Websites' visibility and priority in Internet search engines results.[15]  For example, the meta-tag for "description" in the source code of each MovieTube Website reads: "MovieTube is the No.1 site to watch newly released movies and television series.  It has the largest movie database, fastest streaming speed, and it's 100% free!"[16] Defendants' promotion includes the use of searchable keywords to describe the Infringing Copies as "Newly Released," in "HD," "In Cinema" or "Newly Added," as shown below:[17]



Defendants' aggressive promotion and search-engine optimization of the MovieTube Websites has permitted them to profit off their blatantly infringing activities. In a recent single month, Defendants attracted over 81 million visits to the MovieTube Websites, including almost

---

[15] *Id.* ¶¶ 18-21, Exs. C-D.
[16] *Id.* ¶ 21, Ex D.
[17] *Id.* ¶ 15, Ex. A.

5

61 million visits from users in the United States.[18]  Defendants' advertising-based revenue model likely leads to significant profits for Defendants in consideration of their high traffic, little to no overhead, and the fact that, unlike legitimate digital content services, they pay not a single dollar to license the content on their websites.[19]

Defendants are aware that their activities are illegal. On their Facebook page, Defendants admit that many of their offerings are "pirated movies."[20]  Defendants also admit that the MovieTube Websites' video players "link[] [to] those movies, so [they] have partial responsibility called 'Copyright Infringement' according [to] US law."  Defendants then take the position they are beyond United States law, stating, "Luckily we are not a US company *so we do not need to respect US laws.*"[21]

### 1.  Defendants Commonly Own And Control The MovieTube Websites

The MovieTube Websites appear to be operated by Defendants from Singapore and are located at the following domains: MovieTube.tw, MovieTube.ph, TVStreaming.cc, MovieTube.sx, MovieTube.pw, MovieTubenow.com, MovieTube.tf, MovieTube.co, MovieOnDrive.com, MovieTube.vc, TuneVideo.net, MovieTube.mn, MovieTube.cc, Watch33.tv, MovieTube.cz, Anime1.tv, MovieTube.pm, FunTube.co, MovieTube.la, KissDrama.net, MovieTube.so, MovieTube.click, MovieTubeHD.co, MovieTubeHD.net, MovieTubeHD.org, MovieTubeHD.tv, MovieTubeHD.us, MovieTubenow.in and TuneMovie.me.[22]  Defendants claim common ownership of the MovieTube Websites through the use of the MovieTube brand name and  logo.[23]  In addition, on each of the MovieTube

---

[18] *Id.* ¶ 22, Ex. E.
[19] *See id.* ¶ 12.
[20] *Id.* ¶ 31, Ex. I.
[21] *Id.* (emphasis added).
[22] *Id.* ¶¶ 7, 27, Ex. G.
[23] *Id.* ¶ 23, Ex. A.

Websites, Defendants link to other MovieTube Websites and advise users to choose other MovieTube Websites purportedly hosted by a server located in a country near the user's location:[24]



Defendants' common ownership and control of the MovieTube Websites is also evidenced by: identical and similar WHOIS domain registration information for the domain names of the websites; common design and layout; common meta-tags in the source code; a shared unique identification number with an advertising service provider used by the MovieTube Websites; and common linking to a MovieTube App page.[25]

### 2.     Defendants' Use Of False Identities And Attempts To Avoid Detection And Enforcement

The MovieTube Websites are devoid of any identifiable names or real addresses, and Defendants communicate with potential users through Defendants' Social Media Accounts or email, without revealing their true identities.[26]  The Internet Corporation for Assigned Names and Numbers ("ICANN"), the body that governs domain names, has adopted the Uniform Domain Name Dispute Resolution Policy (the "ICANN Policy"), which requires each registrant of a domain name to provide complete and accurate information to identify the registrant. Despite ICANN Policy, Defendants' WHOIS domain name registrant names and addresses are incomplete or false, containing, for example, nonexistent street addresses or names of a large

---

[24] *Id.*
[25] *Id.* ¶ 24.
[26] *Id.* ¶ 25.

region instead of specific street addresses.[27]  In other instances, Defendants' listed names and addresses are concealed by Defendants' use of a privacy protection service.[28]  Plaintiffs have sought to verify the names and addresses in Defendants' domain name registrations but have been unable to do so even after visiting the purported addresses overseas.[29]  Due to Defendants' deception and concealment, Plaintiffs are currently unaware of Defendants' true identities and locations.[30]

## ARGUMENT

### I.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' ILLEGAL ACTS

To obtain a preliminary injunction, a plaintiff must establish that: (i) it is likely to succeed on the merits; (ii) it is likely to suffer irreparable harm in the absence of preliminary relief; (iii) the balance of equities tips in its favor; and (iv) an injunction is in the public interest. *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).

### A.    Plaintiffs Are Likely To Succeed On The Merits Of Their Claims

#### 1.    Plaintiffs Are Likely To Prevail On Their Direct Copyright Infringement Claim

Plaintiffs are likely to succeed on their copyright infringement claims.  To prevail on their direct copyright infringement claims Plaintiffs must establish: (1) their ownership of valid copyrights; and (2) violation of at least one of Plaintiffs' exclusive rights in those copyrights by Defendants.  *See* 17 U.S.C. § 501; *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985).  With respect to motion pictures and other audio visual works, the Copyright Act specifies the copyright owner's exclusive right "to distribute copies . . . of the copyrighted work to the

---

[27] *Id.* ¶¶ 26-27, Exs. F-G.
[28] *Id.* ¶ 27, Ex. G.
[29] *Id.* ¶ 27.
[30] *Id.* ¶ 28.

public," "to perform the copyrighted work publicly," and "to display the copyrighted work publicly." 17 U.S.C. § 106(3)–(5).

Through their pleadings and declarations, Plaintiffs have established that they are the owners of valid copyrights and/or the relevant exclusive rights under United States copyright laws in Plaintiffs' Works.[31]  Plaintiffs have established that Defendants have infringed Plaintiffs' copyrights in their works by publicly performing, distributing and displaying Plaintiffs' Works, without authorization from Plaintiffs, in violation of 17 U.S.C. §§ 106(3)–(5) and 501.

Defendants stream the Infringing Copies through the MovieTube Websites.[32]  The law is clear that streaming copyrighted works to individual computers constitutes a public performance of those works. *See Am. Broad. Companies, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2510, 189 L. Ed. 2d 476 (2014) ("[T]he Transmit Clause expressly provides that an entity may perform publicly 'whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times.'").  Therefore, when it is unauthorized, courts have held that such streaming constitutes an infringement of the public performance right.  *See WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 277–78 (2d Cir. 2012) (finding that streaming copyrighted television works over the Internet constituted unlicensed public performances); *Warner Bros. Entm't, Inc. v. WTV Sys.*, 824 F. Supp. 2d 1003, 1009–11 (C.D. Cal. 2011) (holding that unlicensed streaming of motion pictures to Internet users violated copyright holders' public performance rights); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332 (D.N.J. 2002) (finding a public performance under § 106(4) when "scenes from [a] copyrighted motion picture are transmitted to" Internet users' "individual computer screens"), *aff'd*, 342 F.3d 191 (3d Cir. 2003).

---

[31] Suh Decl. ¶¶ 4-5, Ex. A; Kaplan Decl. ¶¶ 5-6, Ex. A; Kim Decl. ¶ 4, Ex. A; Stanton Decl. ¶¶ 5-6, Ex. A; Garver Decl. ¶¶ 5-6, Ex. A; Reed Decl. ¶¶ 4-5, Ex. A.
[32] Alemi Decl. ¶¶ 9-10.

Moreover, under Second Circuit law, a website that streams video to Internet users without authorization, even if that website does not host the infringing content, nevertheless violates the public performance right, because "a public performance includes *each step* in the process by which a protected work wends its way to its audience." *NFL v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12 (2d Cir. 2000) (internal quotation marks omitted, emphasis added). Further to this point, the court in *PrimeTime 24* explained that:

> "Under the Copyright Act, the owner of a copyright has the exclusive right publicly to perform and display the copyrighted material. The Act explains that the right to perform copyrighted material publicly includes the right 'to transmit or otherwise communicate a performance . . . of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times.' Congress stated that '[e]ach and every method by which [ ] images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of [§ 106(4) or (5)].'"

*Id.* at 12 (internal citations omitted, alterations and ellipses in original).

Under this authority, it is clear that Defendants' aggregation and provision of players streaming Infringing Copies is a step in the process by which the Infringing Copies "wend [their] way to a [public] audience." *Id.*; *see also Broad. Music, Inc. v. Hearst/ABC Viacom Entm't Servs.*, 746 F. Supp. 320, 328–29 (S.D.N.Y. 1990) (finding public performance when cable supplier transmitted signal to cable operator that then relayed signal to viewers); *Nat'l Ass'n of Broads. v. Copyright Royalty Tribunal*, 809 F.2d 172, 179 n.9 (2d Cir. 1986) (noting that cable retransmissions are recognized as public performances under § 106(4)); *Universal Studios v. Corley*, 273 F.3d 429, 456 (2d Cir. 2001) (finding that a hyperlink "has the functional capacity to bring the content of the linked web page to the user's computer screen . . . to take one almost instantaneously to the desired destination"). In the instant case, where Defendants have framed and embedded the video players in the MovieTube Websites, the links to the content is beyond

"almost instantaneous[]," they are seamless and unseen by the typical user.  *Cf. Aereo*, 134 S. Ct. 2498, at 2507 (emphasizing overall functionality, rather than technical inner workings, when analyzing infringement of the public performance right).

Likewise, Defendants have violated Plaintiffs' exclusive rights "to display the copyrighted work publicly" under § 106(5) by "providing clip previews online."  *Video Pipeline*, 192 F. Supp. 2d at 332 (citing 17 U.S.C. § 106(5)); *see also Getty Images (U.S.), Inc. v. Microsoft Corp.*, No. 14CV7114 DLC, 2014 WL 6633032, at *3 (S.D.N.Y. Nov. 24, 2014) (displaying copyrighted images on website can constitute infringement of public display right).

In addition, Defendants have violated Plaintiffs' rights to distribute copies of Plaintiffs' Works by allowing users to download the Infringing Copies over the Internet through the video player software built into the MovieTube Websites.  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 122 (2d Cir. 2010); *Maverick Recording Co. v. Goldshteyn*, 2006 WL 2166870, at *3 (E.D.N.Y. July 31, 2006); *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1203 (C.D. Cal. 2010) (finding that where defendant transmitted copies of copyrighted works "either as downloads or streams," it "distributed and publicly performed the Copyrighted Recordings" without authorization).

In short, Plaintiffs are likely to prevail on their claims that Defendants have, without authorization, publically performed, displayed and distributed Plaintiffs' Works.

> ### 2.     Plaintiffs Are Likely To Prevail On Their Contributory Copyright Infringement Claim

To prevail on their claims that Defendants contributorily infringe Plaintiffs' Copyrights, Plaintiffs must show that Defendants "with knowledge of the infringing activity, induce[], cause[], or materially contribute[] to the infringing conduct of" other parties.  *Matthew Bender &*

*Co. v. W. Pub. Co.*, 158 F.3d 693, 706 (2d Cir. 1998); *see also Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971).

The evidence shows Defendants' actual knowledge of the copyright infringement that is perpetrated through the MovieTube Websites.  Defendants openly acknowledge on their MovieTube Facebook page that the movies they stream are "pirated movies."[33]  Defendants' MovieTube Websites are "closed" websites in that they do not allow users to make additions or changes to the websites, and the content streamed through the websites can only be selected and provided by Defendants.[34]  Defendants have populated the MovieTube Websites with well-known copyrighted television programs and motion pictures and thus are subjectively aware of facts that would make specific infringement objectively obvious to a reasonable person—namely that unauthorized copies of well-known intellectual property belonging to Plaintiffs, who robustly defend their copyrights, are available on the MovieTube Websites.

At the very least, these facts establish Defendants' "red flag" knowledge of copyright infringement.  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 31 (2d Cir. 2012) ("red flag" knowledge "turns on whether the provider was subjectively aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person"); *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1036, 1043 (9th Cir. 2013) (endorsing the Second Circuit's interpretation of the "red flag" provision in *Viacom* and finding red flag knowledge where the infringed material at issue (i) included the twenty top-grossing movies then playing in U.S. theaters and (ii) was "sufficiently current and well-known that it would have been objectively obvious to a reasonable person that [it] . . . was both copyrighted and not licensed to random members of the public, and . . . therefore infringing").

---

[33] *Id.* Ex. I.
[34] *Id.* ¶ 17.

Defendants' MovieTube Websites are rife with comments from users (i) asking about releases of different versions of the Infringing Copies and (ii) noting that some of Plaintiffs' Works being infringed are not yet legitimately released for home consumption.[35]

Finally, knowledge can be imputed based on prior administrative action by Google, Inc. against other websites that were operated by Defendants, namely: YouTubeOnFire.com, YouTubeOnSale.com, YouTubeMainPage.com, YouTubeSoSexy.com and YouTubeOn.com.[36] The domains for these websites were ordered to be transferred to Google by the administrative panel in an ICANN Policy arbitration proceeding based upon a finding that Defendants had registered and used the domains in bad faith (including for infringement of the YOUTUBE trademark).[37]  In that proceeding, Google argued—and the panel's decision recited—"that each website include[d] a copyright line on the bottom indicating that an entity named 'MovieTube' owns the copyright to the page" and "display[ed] identical pages all offering digital content, including movies, television shows, and music videos, many of which are presumed to be pirated copies of copyrighted products that Respondent is making available for illegal download or viewing."[38]

Defendants materially contribute to other third-party infringement through the use of MovieTube Websites to catalog, promote, and link to Infringing Copies posted and/or hosted by third parties.  Defendants aggregate and provide links to Infringing Copies, embed viewing windows on the MovieTube Websites in which Infringing Copies stream, and market their offering of Infringing Copies both on the MovieTube Websites and through extensive use of

---

[35] *Id.* ¶ 20, Ex. A.
[36] *Id.* ¶¶ 30, 32, Exs. H & J.
[37] *Id.* ¶ 32, Ex. J.
[38] *Id.*

social media.[39]  This constitutes material contribution to the third-party infringement of Plaintiffs' public performance rights.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) ("[A]ssist[ing] a worldwide audience of users to access infringing materials" constitutes material contribution.); *Gershwin Publ'g*, 443 F.2d at 1163 (Defendant's "pervasive participation in the formation and direction of" the platform that performed the infringing works "amply support the district court's finding that it 'caused this copyright infringement.'").

In sum, Plaintiffs are likely to prevail on their claim that Defendants are contributorily infringing Plaintiffs' Copyrights.

### 3.    Plaintiffs Are Likely To Prevail On Their Trademark Infringement Claims

To establish liability for trademark infringement, Plaintiffs must show:  (1) the marks at issue are entitled to protection; (2) Defendants do not have consent to use the marks; (3) Defendants use the marks to distribute or advertise the Infringing Copies; and (4) Defendants' use of the marks is likely to cause confusion. *See* 15 U.S.C. § 1114(1); *Otokoyama Co. v. Wine of Japan Import, Inc*., 175 F.3d 266, 270 (2d Cir. 1999).

Plaintiffs' Marks are entitled to protection. Through their pleadings and declarations, Plaintiffs have verified that they are the owners of the rights, titles and interests in and to their respective Marks in connection with the distribution of copies of Plaintiffs' Works— unauthorized copies of which Defendants are distributing using Plaintiffs' Marks.[40]

Plaintiffs also have established that (i) Defendants' use of Plaintiffs' Marks is not authorized by Plaintiffs, and (ii) the unauthorized copies of Plaintiffs' Works that Defendants are

---

[39] *Id.*¶ 10.
[40] Suh Decl., ¶¶ 6-10, Ex. B; Kaplan Decl. ¶¶ 7-11, Ex. B; Kim Decl. ¶¶ 5-9, Ex. B; Stanton Decl. ¶¶ 7-11, Ex. B; Garver Decl. ¶¶ 7-11, Ex. B; Reed Decl. ¶¶ 6-10, Ex. B.

offering bear marks that are identical to or substantially indistinguishable from Plaintiffs'

federally registered marks, which Plaintiffs are using in commerce.[41]   As to the element of

likelihood of confusion, courts in this District have found that, "where [identical] marks are

involved, it is not necessary to perform the step-by-step examination of each Polaroid factor" to

find likelihood of confusion.  *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d

448, 455 (S.D.N.Y. 2005) (internal quotation marks and citation omitted); *see also Fendi Adele*

*S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010) (finding same).

Moreover, the Second Circuit and courts in this and other districts have found

infringement where defendants have used plaintiffs' trademarks to distribute unauthorized goods,

in part because the plaintiffs are unable to control the quality of their goods.  As the Second

Circuit opined: "one of the most valuable and important protections afforded by the Lanham Act

is the right to control the quality of the goods [distributed] under the holder's trademark." *El*

*Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986); *see also Shell*

*Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (defendant infringed

Shell trademark by marketing bulk authentic Shell oil according to its own and not Shell's

quality control standards); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816

F.2d 68, 75 (2d Cir. 1987) (Cardamone, J., concurring) (territorial restriction preventing United

States sale of Cabbage Patch dolls with Spanish-language instructions is quality control measure;

sale of dolls in United States infringes trademark); *Adolph Coors Co. v. A. Genderson & Sons,*

*Inc.*, 486 F. Supp. 131, 135-36 (D. Colo. 1980) (distribution of plaintiff's beer without regard to

quality control standards is trademark infringement).  Moreover, under these authorities, a

plaintiff may prevail irrespective of whether the goods actually deteriorated. *See El Greco*

---

[41] Alemi Decl. ¶ 16, Ex. B; Suh Decl., ¶¶ 11-13; Kaplan Decl. ¶¶ 12-14; Kim Decl. ¶¶ 5-9; Stanton Decl. ¶¶ 12-14;
Garver Decl. ¶¶ 12-14; Reed Decl. ¶ 11.

*Leather Prods. Co.*, 806 F.2d at 395 ("[T]he actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.").

In evaluating trademark infringement claims based on the trademarks in motion pictures (and trademarks displayed on the face of photographs), courts have applied the relevant likelihood of confusion factors as they would in any trademark infringement claim. *See Video Pipeline*, 275 F. Supp. 2d at 569–74 (weighing likelihood of confusion factors and concluding use of studio marks in movie trailers edited by infringer constituted trademark infringement); *Playboy Enters., Inc. v. Frena*, 839 F. Supp. 1552, 1559–61 (M.D. Fla. 1993), *superseded by statute on other grounds* (weighing likelihood of confusion factors and concluding defendant's display of plaintiff's trademarks on unauthorized copies of plaintiff's photographs infringed trademarks); *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 623 (4th Cir. 2001) (same).

In the current matter, Plaintiffs have the right to control the quality of Plaintiffs' Works, including when and in what manner the works are distributed.[42]  Defendants distribute Infringing Copies of Plaintiffs' Works without regard to Plaintiffs' quality controls and user comments complaining about quality (including of Infringing Copies made by taking a video of a theatrical performance) are rampant on the MovieTube Websites.[43]

As such, Plaintiffs have shown they are likely to prevail on their trademark infringement claims.

**B.     Plaintiffs Have No Adequate Remedy At Law And Defendants' Public Performance, Distribution And Display Of Infringing Copies Irreparably Harms Plaintiffs**

The Second Circuit in *Salinger v. Colting* recognized that while courts must not simply presume irreparable harm in copyright cases, "[t]his is not to say that most copyright plaintiffs

---

[42] Suh Decl. ¶ 5; Kaplan Decl. ¶ 6; Kim Decl. ¶ 4; Stanton Decl. ¶ 6; Garver Decl. ¶ 6; Reed Decl. ¶ 5.
[43] Alemi Decl. ¶ 20.

who have shown a likelihood of success on the merits would not be irreparably harmed absent preliminary injunctive relief," and that "[a]s an empirical matter, that may well be the case, and the historical tendency to issue preliminary injunctions readily in copyright cases may reflect just that."  607 F.3d at 82.  The *Salinger* court also noted that "[i]n the context of copyright infringement cases, the harm to the plaintiff's property interest has often been characterized as irreparable in light of possible market confusion."  *Id.* at 81 (citing *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96–97 (2d Cir. 2002)).  Furthermore, "courts have tended to issue injunctions in this context because 'to prove the loss of sales due to infringement is . . . notoriously difficult.'" *Salinger*, 607 F.3d at 81 (quoting *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)).  Consequently, irreparable harm has been readily found in copyright infringement cases.  *See, e.g., WPIX*, 691 F.3d at 285–87 (2d Cir. 2012) (affirming finding of irreparable harm by Internet streaming of copyrighted television programming because (i) that streaming would substantially diminish the value of that programming—such as from advertising revenue and by disturbing licensing relationships and distribution windows, (ii) the plaintiffs' losses would have been difficult to measure and monetary damages insufficient to remedy the harms, and (iii) the defendant would have been unable to pay damages should the plaintiffs prevail).

In the instant case, irreparable harm is present for the same reasons recognized in *Salinger* and similar cases.  Specifically, Defendants' infringement (i) deprives Plaintiffs of their "exclusive right to decide when, where, to whom, and for how much they will authorize transmission of their Copyrighted Works to the public," *Warner Bros. Entm't*, 824 F. Supp. 2d at 1012; (ii) deprives Plaintiffs of revenue; jeopardizes the existence of Plaintiffs' licensees businesses, such as authorized Internet video streaming services; tarnishes users' perception of

video on demand as an attractive option for viewing Plaintiffs' Works; and "threatens the development of a successful and lawful . . . Internet-based video on demand market" by threatening to "confuse consumers about video on demand products, and to create incorrect but lasting impressions with consumers about what constitutes lawful video on demand exploitation of Plaintiffs' Works, including confusion or doubt about whether payment is required for access to the Copyrighted Works," *id.* at 1012–13.

Moreover, courts have applied *Salinger* in trademark cases, ending a presumption of irreparable harm but finding that irreparable harm can easily be demonstrated by pointing to the fact that the trademark owner's goodwill and reputation are in peril.  *See, e.g.*, *U.S. Polo Assoc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011); and *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 410–13 (S.D.N.Y. 2011).  That has been shown here.[44] Indeed, it is likely that some viewers of the Infringing Copies will mistakenly attribute to one or more Plaintiffs any defects or negative impressions they have of these poor or lesser quality copies, placing such Plaintiffs' reputations and goodwill at risk.[45]  An award of monetary damages could not adequately compensate Plaintiffs for such a loss of reputation and goodwill. What is more, given that Defendants hide their true identities and operate from outside the United States, it is unlikely that Plaintiffs can recover any monetary damages award they might obtain.

In sum, the harm to Plaintiffs' goodwill or loss of control over reputation is irreparable, and such irreparable injury weighs in favor of granting a preliminary injunction.  *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) ("Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it

---

[44] *See* Suh Decl., ¶¶ 17, 18; Kaplan Decl. ¶¶ 18, 19; Kim Decl. ¶¶ 16, 17; Stanton Decl. ¶ 18; Garver Decl. ¶¶ 18, 19; Reed Decl. ¶ 13.
[45] Suh Decl., ¶ 19; Kaplan Decl. ¶ 20; Kim Decl. ¶ 18-19; Stanton Decl. ¶ 19; Garver Decl. ¶ 20.

will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)).

### C.    The Balance of Hardships and Public Interest Favor an Injunction

As explained above, the harm to Plaintiffs is irreparable. In contrast, any potential harm to Defendants is purely monetary.  Moreover, Defendants have no legitimate interest in distributing Infringing Copies, and, given "the probable outcome of this action, this is a loss which [defendants] may justifiably be called upon to bear."  *Corning Glass Works v. Jeannette Glass Co*., 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

Furthermore, the public interest undoubtedly favors an injunction.  The "public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming."  *WPIX*, 691 F.3d 275 at 287. Inadequate protections for copyright owners "can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works."  *Id.* (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 961 (2005)).  "Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work."  *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983).  Additionally, the "public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."  *N.Y.C. Triathlon*, 704 F. Supp. 2d at 344.

19

## II.   THE PRELIMINARY INJUNCTION ORDER SHOULD DIRECT SERVICE PROVIDERS TO CEASE PROVIDING SERVICES TO DEFENDANTS

Due to the breadth of the Defendants' intentional infringement, which is orchestrated from outside the United States, Defendants' use of false WHOIS information and operation exclusively over the Internet, and Defendants' reliance on domain name registries and other third-party service providers and their network of affiliates to carry out their activities, the Court should order that: (i) registries and registrars disable the domains to the MovieTube Websites and (ii) third-party service providers cease providing services to the MovieTube Websites and Defendants in relation to the Infringing Copies.

This Court's power to issue such relief is supported by numerous statutes and authorities, including: (i) 17 U.S.C. § 502, which allows a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright;" (ii) 15 U.S.C § 1116(a), which provides for an injunction "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 43 [15 U.S.C. § 1125];" (iii) Federal Rule of Civil Procedure 65(d)(2), which imbues courts with the power to issue injunctions that bind parties, parties' officers, agents, servants, employees, and attorneys and any "other persons who are in active concert or participation with" any such individuals or entities; (iv) the Court's "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief," which encompasses injunctions as broad as restraining defendants' assets to preserve them for disgorgement of profits and equitable accounting, *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 986–87 (11th Cir. 1995); *see also Datatech Enters. LLC v. FF Magnat Ltd.*, No. C 12-04500, 2012 U.S. Dist. LEXIS 131711, at *11-12 (N.D. Cal. Sept. 14,

2012); *Reebok Int'l Ltd. v. Marnatech Enter.*, 970 F.2d 552, 559 (9th Cir. 1992); and/or (v) the Court's power pursuant to 28 U.S.C. § 1651 (the All Writs Act) to issue all writs necessary or appropriate in aid of its jurisdiction and agreeable to the usages and principles of law.

Courts have granted similar interim relief directed to third-party service providers in cases with similar facts.  The first such case, *The North Face Apparel Corp. v. Fujian Sharing Import & Export Ltd.* ("*Fujian*"), 10-Civ-1630 (AKH) (S.D.N.Y.), was brought against defendants in China selling counterfeit goods through the Internet directly to consumers in the United States.  In *Fujian*, the district court granted an *ex parte* temporary restraining order, seizure order, asset restraining order, and domain-name transfer order, later continued by a preliminary injunction order.  The latter required, *inter alia*:

- domain name registries and/or registrars holding or listing one or more of the domains used in connection with infringing websites to temporarily disable access to the websites through a registry hold or otherwise, pending further order of the court; and

- any third party providing services to defendants and their web sites – including Internet service providers, back-end service providers, sponsored search engine or ad-word providers, merchant account providers, payment processors, shippers, domain name registrar and domain name registries – upon receiving notice of the order to deliver to plaintiffs copies of documents and records relating to the defendants and their web sites, assets and business operations.

Temporary Restraining Order, Seizure Order, Asset Restraining Order, Domain Name Transfer Order and Order to Show Cause for Preliminary Injunction [Doc. No. 15], *Fujian*, at 1–4 (Sept. 13, 2010) (attached as Exhibit A to the Declaration of George P. Wukoson, dated July 22, 2015 ("Wukoson Decl.")).

When a domain name registry refused to comply with, and challenged the reach of the *Fujian* injunction, the court stated that the injunction put the registry on notice and alerted it to "no longer play its role in allowing [users] to connect to" the defendants' websites because failing to take corrective action once noticed would constitute the "unlawful act" of aiding and

abetting the defendants' unlawful activities and would violate the injunction. Order [Doc. No. 56], *Fujian*, at 5 (June 24, 2011) (Wukoson Decl. Ex. B)

Since *Fujian*, other judges in this District and in other Districts have granted similar relief directed to third-party service providers in trademark and copyright cases.[46]  For example, citing *Fujian*, a court held that a third party that was providing domain name server, content delivery and reverse-proxy services to the defendants was in active concert and participation with those defendants and thus bound by the temporary restraining order and the preliminary injunction order issued by that court.  Memorandum & Order [Doc. No. 58], *Arista Records, LLC v. Tkach*, No. 15-cv-3701 (AKN), at 3, 5–11 (S.D.N.Y. June 3, 2015) (Wukoson Decl. Ex. C).

In addition, at least two courts in this District have issued such relief in cases involving motion picture and television program content.  In *Warner Bros. Ent., Inc. v. Doe*, the court granted a preliminary injunction (following grant of an *ex parte* temporary restraining order) against defendants selling box sets on the Internet of Blu-ray discs and DVDs infringing the plaintiffs' copyrights and trademarks in motion pictures and television programs.  Preliminary Injunction Order [Doc. No. 6], No. 14-cv-3492 (KPF) (S.D.N.Y. May 29, 2014) (Wukoson Decl. Ex. D).  Likewise, in *Advanced Access Content System Licensing Administrator, LLC v. Shen*, another court in this District granted a preliminary injunction against defendants distributing software on the Internet that circumvented copy and access protection of HD DVD and Blu-ray discs for motion pictures and television programs, in violation of the anti-circumvention provisions of the Digital Millennium Copyright Act.  Order [Doc. No. 21], No. 14-cv-1112 (VSB) (S.D.N.Y. Mar. 4, 2014) (Wukoson Decl. Ex. E).  In each case, the preliminary injunction

---

[46] *See, e.g.*, Temporary Restraining Order [Doc. No. 7], *Belstaff Group SA v. Doe*, No. 15-cv-2242 (S.D.N.Y. Apr. 8, 2015); Temporary Restraining Order [Doc. No. 12], *Richemont Int'l SA v. Xiao*, No. 13-cv-9071 (S.D.N.Y. Dec. 23, 2013); Temporary Restraining Order [Doc. No. 16], *Richemont Int'l SA v. Chen*, No. 12-cv-6689 (S.D.N.Y. Sept. 4, 2012); Temporary Restraining Order [Doc. No. 7], *The Nat'l Football League v. Chen*, No. 11-Civ-0344 (WHP) (S.D.N.Y. Jan. 19, 2011) (collected in Wukoson Decl. Ex. G).

order (i) ordered domain name registries and registrars to disable the domain names of the defendants' infringing websites; and (ii) ordered third-party service providers, including web hosting and payment service providers, to cease or disable their services to defendants' infringing websites.

Most recently, in *Showtime Networks, Inc. v. Doe 1*, a court in the Central District of California issued a temporary restraining order directing service providers to cease providing services to the defendants' websites that intended to provide an unauthorized stream of television coverage of the recent Manny Pacquiao and Floyd Mayweather boxing match.  *See* Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue, No. 15-cv-3147, Doc. No. 20 (C.D. Cal. April 30, 2015) (Wukoson Decl. Ex. F).

Given that Defendants undertake their operations and illegal activities from outside the United States, it is essential for preventing further irreparable harm to Plaintiffs that injunctive relief include orders directed at third parties whose services enable Defendants' activities.  Thus, the Court should grant the relief requested in the proposed preliminary injunction order, including requiring that: (i) registries and registrars disable the domain names used to operate the MovieTube Websites and (ii) third-party service providers cease providing services to the MovieTube Websites and Defendants in relation to the Infringing Copies.

## III.   PLAINTIFFS ARE ENTITLED TO AN ORDER PREVENTING THE FRAUDULENT TRANSFER OF ASSETS

Plaintiffs ultimately will be entitled to a disgorgement of Defendants' profits attributable to copyright infringement[47] and an equitable accounting of Defendants' profits from trademark infringement.[48]  On these bases, courts have repeatedly held that district courts possess the inherent equitable authority to restrain a defendant's assets so that these equitable remedies are

---

[47] 17 U.S.C. § 504(b).
[48] 15 U.S.C. § 1117.

not later frustrated by dissipation of assets. *See, e.g.*, *Datatech Enters.*, 2012 U.S. Dist. LEXIS 131711, at *11–12; *Microsoft Corp. v. Jun Yan*, No. 10-cv-00162, 2010 U.S. Dist. LEXIS 14933, at *7–8 (D. Conn. Feb. 18, 2010); *Gucci Am., Inc. v. Weixing Li,* 768 F.3d 122, 130 (2d Cir. 2014); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007) (unpublished); *Levi Strauss & Co. v. Sunrise Int'l Trading*, *Inc*., 51 F.3d 982, 987 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enter.*, 737 F. Supp. 1521, 1526 (S.D. Cal. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992).

To obtain an order restraining a defendant's assets, a plaintiff must show "a likelihood of dissipation of the claimed assets, or other inability to recover money damages, if relief is not granted." *Datatech Enters.*, 2012 U.S. Dist. LEXIS 131711, at *12 (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)).  As discussed herein, Defendants have invoked numerous mechanisms to conceal their identities—including using false names and providing incomplete or nonsensical registration information for their domain names.  This is the type of evasive behavior that justifies an asset restraint to ensure that Plaintiffs' remedies are not rendered meaningless.

## IV.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY

Expedited discovery may be granted when the requesting party demonstrates: (i) irreparable injury; (ii) some likelihood of success on the merits; (iii) some connection between expedited discovery and the avoidance of irreparable injury; and (iv) some evidence that the injury that will result without expedited discovery looms greater than the injury defendants will suffer if expedited relief is granted.  *Twentieth Century Fox Film Corp. v. Mow Trading Corp.*, 749 F. Supp. 473, 475 (S.D.N.Y. 1990).

While Plaintiffs have learned some aspects of Defendants' illegal activities, Plaintiffs do not yet know with any certainty the full scope of those activities, the source or location of

Defendants, or where the proceeds from Defendants' illegal activities have gone.  Given

Defendants' efforts to hide their identities and infringing activities, and given that Defendants

appear to be coordinating their infringing activities—which are directed to the United States—

from outside the United States, Plaintiffs will not likely ascertain with any certainty the full

scope of Defendants' activities or Defendants' identities.  Nonetheless, Plaintiffs should be given

the tools to ascertain information regarding the flow of Defendants' revenues and the nature of

their activities, to the extent possible.

The discovery requested on an expedited basis in Plaintiffs' Proposed Preliminary

Injunction Order has been precisely defined and carefully limited to include only what is

essential to prevent further irreparable harm. Plaintiffs are unaware of any reason that

Defendants or third parties cannot comply with these expedited discovery requests without undue

burden.  More importantly, Defendants have engaged in numerous deceptive practices that

indicate Plaintiffs may lose the opportunity for meaningful discovery without the requested

relief. Accordingly, the request for expedited discovery should be granted.

## **CONCLUSION**

The Court should grant the relief requested in the proposed preliminary injunction order,

including requiring that: (i) registries and registrars temporarily disable the domain names used

to operate the MovieTube Websites and (ii) third-party service providers cease providing

services to the MovieTube Websites and Defendants in relation to the Infringing Copies.

Dated: July 24, 2015

Respectfully submitted,

By:  _/s/ G. Roxanne Elings_____

DAVIS WRIGHT TREMAINE LLP
G. Roxanne Elings
(RoxanneElings@dwt.com)

George P. Wukoson
(GeorgeWukoson@dwt.com)
1633 Broadway, 27th Floor
New York, New York 10019
Telephone: (212) 489-8230
Facsimile: (212) 489-8340

James D. Nguyen (*Pro Hac Vice Pending*)
(jimmynguyen@dwt.com)
865 S. Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone: (213) 633-6800
Facsimile: (213) 633-6899

MOTION PICTURE ASSOCIATION OF
AMERICA, INC.
Karen R. Thorland (*Pro Hac Vice Pending*)
(karen_thorland@mpaa.org)
15301 Ventura Blvd.
Building E
Sherman Oaks, CA 91403
Telephone: (818) 935-5812

*Attorneys for Plaintiffs*