## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION; WARNER BROS. ENTERTAINMENT INC.; TWENTIETH CENTURY FOX FILM CORPORATION; COLUMBIA PICTURES INDUSTRIES, INC.; UNIVERSAL CITY STUDIOS LLC; UNIVERSAL STUDIOS HOME ENTERTAINMENT LLC; and DISNEY ENTERPRISES, INC., | Case No. 1:15-cv-05819-PAC |

Plaintiffs,

v.

JOHN DOES, JANE DOES and/or XYZ
CORPORATIONS d/b/a MOVIETUBE; and
JOHN DOES, JANE DOES and/or XYZ
CORPORATIONS 2-100,

Defendants.

---

**BRIEF OF GOOGLE INC., FACEBOOK, INC., TUMBLR, INC., TWITTER, INC., AND YAHOO!, INC. AS *AMICI CURIAE* IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Brian M. Willen
Jason B. Mollick
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Phone: (212) 999-5800
Fax: (212) 999-5899
Email: bwillen@wsgr.com
Email: jmollick@wsgr.com

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..................................................................................ii

INTRODUCTION ............................................................................................ 1

INTERESTS OF THE AMICI ........................................................................... 2

ARGUMENT.................................................................................................... 4

I.      Rule 65 Does Not Allow an Injunction Against the Neutral Service
        Providers ........................................................................................... 5

        A.      "Active Concert or Participation" is Required to Bind a Nonparty ............ 5

        B.      *Amici* and Other Service Providers Cannot Be Enjoined Because
                They Are Not in Active Concert with Defendants........................................ 6

        C.      The Orders Plaintiffs Cite Do Not Authorize An Injunction Against
                The Neutral Service Providers Here ............................................... 9

II.     Plaintiffs Cannot Circumvent the DMCA by Seeking Broad *Ex Parte*
        Injunctive Relief Against the Neutral Service Providers............................. 12

        A.      The DMCA Protects Online Service Providers Against Copyright
                Liability and Strictly Limits the Injunctions That Can Be Imposed .......... 12

        B.      Plaintiffs' Requested Injunction Would Be Improper Even If the
                Neutral Service Providers Were Culpable Defendants............................... 15

III.    Plaintiffs Cannot Use the All Writs Act to Bind Nonparty Service
        Providers .......................................................................................... 17

        A.      The All Writs Act is a Narrow Gap-Filling Provision That Cannot
                Displace Other Laws and Cannot Be Used to Burden Third Parties.......... 17

        B.      The All Writs Act Does Not Authorize an Injunction Here......................... 19

        C.      The Court Should Not Use the All Writs Act to Resurrect SOPA .............. 20

CONCLUSION.............................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
    96 F.3d 1390 (Fed. Cir. 1996)..............................................................18

*Alemite Mfg. Corp. v. Staff*,
    42 F.2d 832 (2d Cir. 1930)................................................................5, 6

*Arista Records LLC v. Tkach*,
    No. 15-cv-3701-AJN, Dkt. 58 (S.D.N.Y. June 3, 2015).......................9, 10, 11

*Blockowicz v. Williams*,
    630 F.3d 563 (7th Cir. 2010) ..........................................................8, 9, 10, 11

*Bobolas v. Does*,
    No. CV-10-2056-PHX-DGC,
    2010 U.S. Dist. LEXIS 110856 (D. Ariz. Oct. 1, 2010) .....................7

*Chase Nat'l Bank v. City of Norwalk, Ohio*,
    291 U.S. 431 (1934)........................................................................6

*CoStar Grp., Inc. v. LoopNet, Inc.*,
    373 F.3d 544 (4th Cir. 2004) ..........................................................13

*Fla. Med. Ass'n, Inc. v. United States Dep't of Health, Educ. and Welfare*,
    601 F.2d 199 (5th Cir. 1979) ..........................................................19

*Hansberry v. Lee*,
    311 U.S. 32 (1940)..........................................................................5

*In re An Application of the United States for an Order Authorizing*
    *Disclosure of Location Info. of a Specified Wireless Tel.*,
    849 F. Supp. 2d 526 (D. Md. 2011) ................................................19

*In re An Application of the United States for an Order Authorizing*
    *the Use of a Pen Register*,
    396 F. Supp. 2d 294 (E.D.N.Y. 2005) .............................................18

*In re Baldwin-United Corp.*,
    770 F.2d 328 (2d Cir. 1985)............................................................20

*ITT Cmty. Dev. Corp. v. Barton*,
    569 F.2d 1351 (5th Cir. 1978) ........................................................18, 20

*Microsystems Software, Inc. v. Scandinavia Online AB*,
    226 F.3d 35 (1st Cir. 2000)..................................................................6

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)..........................................................................7

*N.Y. v. Operation Rescue Nat'l*,
    80 F.3d 64 (2d Cir. 1996)..................................................................5

*The North Face Apparel Corp. v. Fujian Sharing Import & Export Ltd.*,
    No. 10-cv-1630-AKH, Dkt. 56 (S.D.N.Y. June 24, 2011) .........................10, 11

*Pa. Bureau of Correction v. United States Marshals Serv.*,
    474 U.S. 34 (1985)....................................................................18, 19, 21

*Paramount Pictures Corp. v. Carol Publ'g Grp.*,
    25 F. Supp. 2d 372 (S.D.N.Y. 1998)...............................................8, 12

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ....................................................12, 13

*Regal Knitwear Co. v. NLRB*,
    324 U.S. 9 (1945)............................................................................6

*Syngenta Crop Prot., Inc. v. Henson*,
    537 U.S. 28 (2002).........................................................................19

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)........................................................................1

*United States v. Hall*,
    583 F. Supp. 717 (E.D. Va. 1984) ..............................................18, 20

*United States v. N.Y. Tel. Co.*,
    434 U.S. 159 (1977)..................................................................19, 20

*United States v. Regan*,
    858 F.2d 115 (2d Cir. 1988)..............................................................5

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    718 F. Supp. 2d 514 (S.D.N.Y. 2010),
    *aff'd in part, vacated in part*, 676 F.3d 19 (2d Cir. 2012) .................15

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012).........................................................12, 13

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012),
    *aff'd*, 569 Fed. Appx. 51 (2d Cir. 2014) .........................................................15

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969)..............................................................................................6, 7

## STATUTES

17 U.S.C. § 512.................................................................................................... passim

28 U.S.C. § 1651(a) .......................................................................................................17

## RULES

Fed. R. Civ. P. 65............................................................................................... passim

## OTHER AUTHORITIES

21A Karl Oakes,
    *Fed. Proc., L. Ed.* § 51:208 (2015 ed.)...........................................................17

David Carr, *The Danger Of an Attack on Piracy Online*, N.Y. Times, Jan. 1, 2012,
    *available at* http://www.nytimes.com/2012/01/02/business/media/the-
    danger-of-an-attack-on-piracy-online.html.......................................................21

Eriq Gardner, *MPAA Testing the Limits of Pirate Site Blocking in MovieTube
    Lawsuit*, The Hollywood Reporter, July 30, 2015, *available at*
    http://www.hollywoodreporter.com/thr-esq/mpaa-testing-limits-pirate-site-
    812126.............................................................................................................3, 21

H.R. 3261, § 102(c)(2)(B)..........................................................................................1, 21

Jonathan Weisman, *After an Online Firestorm, Congress Shelves Antipiracy Bills*,
    N.Y. Times, Jan. 20, 2012, *available at* http://www.ny
    times.com/2012/01/21/technology/senate-postpones-piracy-vote.html ..........21

S. Rep. No. 105-190 (1998) ..................................................................................... passim

## INTRODUCTION

Plaintiffs are asking the Court to grant a preliminary injunction not just against the named Defendants, but also against a wide array of online service providers—from search engines, to web hosts, to social networking services—and require them to "cease providing services to the MovieTube Websites and Defendants[.]" None of those providers is a party to this case, and Plaintiffs make no claim that any of them have violated the law or play any direct role in the Defendants' allegedly infringing activities.

Plaintiffs' effort to bind the entire Internet to a sweeping preliminary injunction is impermissible. It violates basic principles of due process and oversteps the bounds of Federal Rule of Civil Procedure 65, which restricts injunctions to parties, their agents, and those who actively participate in a party's violations. The proposed order also ignores the Digital Millennium Copyright Act ("DMCA"), which specifically limits the injunctive relief that can be imposed on online service providers in copyright cases. Even if Plaintiffs had named those providers as defendants and obtained a final judgment against them, the DMCA would not permit the relief that Plaintiffs are asking for at the outset of their case, where they have not even tried to claim that these nonparties have acted unlawfully.

*Amici* recognize the vital importance of combating infringement on the Internet, and they work with rightsholders, including Plaintiffs themselves, to address those issues on a daily basis. But in pursuing the Defendants here, and attempting to resurrect the defeated Stop Online Piracy Act, H.R. 3261 ("SOPA"), Plaintiffs disregard established limits on judicial power and the careful balance that Congress has struck between the rights of online service providers and copyright owners. Those protections cannot be swept aside so readily. Plaintiffs do not need, and should not be allowed, to "[c]ut a great road through the law to get after the Devil[.]" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 195 (1978) (quoting Robert Bolt, *A Man For All Seasons*).

## INTERESTS OF THE AMICI

*Amici* are leading technology companies that provide online services to billions of people. They have a special interest in this case because their services (YouTube, Facebook, Twitter, Flickr, and Tumblr) are specifically called out in Plaintiffs' proposed injunction. *See* Order to Show Cause, Dkt. 12, ¶ 4. *Amici* do not condone any use of their services for purposes of infringement and have devoted substantial resources over the years to address such infringing activity. But *amici* are united in their concern that Plaintiffs' proposed injunction is legally impermissible and would have serious consequences for the entire online community.

**Google Inc.** ("Google") is a leading Internet search engine and provides a wide range of other products and services—including email through its Gmail service, a blogging platform through Blogger, and social-networking tools—that empower people around the world to create, find, organize, and share information. Plaintiffs identify Google's online video service, YouTube, as a "user generated and online content service" that they seek to bind via the preliminary injunction.

**Facebook, Inc.** ("Facebook") is one of the world's leading providers of online networking services, and is one of the top five most-trafficked websites in the world. Facebook provides a free Internet-based service that enables more than 1.4 billion users to connect with their friends and family, to discover what is going on in the world around them, and to share and publish the opinions, ideas, photos, and activities that matter to them and the people they care about. Plaintiffs identify Facebook as a "social media service" that would be subject to the proposed injunction.

**Tumblr, Inc.** ("Tumblr") provides a platform for users to share their artwork, writing, photos, audio, and video with a worldwide audience. Tumblr is home to over 248 million blogs and 117 billion posts. Plaintiffs identify Tumblr as a "user generated and online content service" that would be bound by the injunction.

**Twitter, Inc.** ("Twitter") is a global platform for public self-expression and conversation. Twitter has more than 316 million monthly active users who share approximately half a billion Tweets each day. Plaintiffs identify Twitter as a "social media service" that would be covered by the proposed injunction.

**Yahoo!, Inc.** ("Yahoo") is a global company operating one of the most trafficked Internet destinations in the world. Yahoo is focused on making the world's daily habits inspiring and entertaining—whether searching the web, emailing friends, sharing photos with family, or simply checking the weather, sports scores, or stock quotes. Plaintiffs identify Yahoo's photo-sharing service, Flickr, as a "user generated and online content service" under the proposed injunction.

Given the nature of their services, and the role they play in facilitating the exchange of information and ideas among so many Internet users, *amici* have a compelling interest in ensuring that the rules governing injunctions against online intermediaries are scrupulously followed. The injunction that Plaintiffs have requested against *amici* and other service providers clearly violates those rules. *Amici* urge the Court not only to strike the objectionable provisions in Plaintiffs' proposed injunction, but also to issue a clear ruling setting out the limits on injunctions against online intermediaries. Such a ruling would assist other courts facing similarly overbroad requests. Plaintiffs in similar cases have increasingly been seeking expansive injunctions against nonparty service providers, often obtaining such orders by proceeding without notice or opposition. This case continues that pattern. *See, e.g.*, Eriq Gardner, *MPAA Testing the Limits of Pirate Site Blocking in MovieTube Lawsuit*, THE HOLLYWOOD REPORTER, July 30, 2015, *available at* http://www.hollywoodreporter.com/thr-esq/mpaa-testing-limits-pirate-site-812126. While these orders are of no precedential or persuasive value here, they underscore that the problems raised in this case are recurring and make it especially important for courts to reaffirm the rules protecting online services from being enjoined in cases to which they are not parties.

Such a ruling would be all the more appropriate in light of the fact that Congress recently rejected a push to change the law to authorize exactly these kinds of broad-based online blocking orders. Specifically, SOPA would have allowed courts to require online intermediaries to cease providing services to entire websites based on claims of infringement. This legislation failed in 2012 after a public outcry about the dangers it posed to a free and open Internet. This recent history should make courts wary about efforts to circumvent the legislative process to obtain nearly identical relief through an expansive and erroneous reading of the existing legal authorities.

In short, while *amici* take no position as to whether a preliminary injunction should issue against Defendants, the Court should make clear that any such order does not and cannot bind *amici* and other nonparty online service providers.

## ARGUMENT

Plaintiffs' proposed preliminary injunction is breathtakingly broad. It would apply not just to Defendants and their agents but also to "third parties providing services used in connection with Defendants' operations[.]" Order to Show Cause, Dkt. 12, ¶ 1. By its terms, the order would bind "domain name registries" (*id.* ¶ 2), "content delivery networks and domain name server systems" (*id.* ¶ 3), "web-hosting providers, back-end service providers, digital advertising service providers, search-based online advertising services ..., domain name registration privacy protection services, providers of social media services (e.g., Facebook and Twitter) and user generated and online content services (e.g., YouTube, Flickr, and Tumblr)" to "cease providing or disable provision of such services" to Defendants (*id.* ¶ 4).[1] It is no exaggeration to say that such an injunction would bind the entire Internet. But the law does not allow what Plaintiffs are seeking. The proposed injunction violates Federal Rule of Civil Procedure 65 and

---

[1] For ease of reference in this brief, we will call the third-party service providers referenced in paragraphs 2-4 of the proposed injunction "Neutral Service Providers."

the safe-harbor provisions of the DMCA, and it is not authorized by the All Writs Act. Applying these established authorities, and recognizing the lessons of the debate over SOPA, the Court should decline Plaintiffs' invitation to enjoin the world.

## I.      Rule 65 Does Not Allow an Injunction Against the Neutral Service Providers

As nonparties to this case, the Neutral Service Providers cannot be bound by an injunction unless they are shown to be working "in active concert or participation" with Defendants. Fed. R. Civ. P. 65(d)(2)(C). This strict standard requires clear evidence that each particular nonparty is directly working to help Defendants evade an injunction. Plaintiffs do not attempt to make that showing, nor could they.

### A.      "Active Concert or Participation" is Required to Bind a Nonparty

Rule 65 of the Federal Rules of Civil Procedure codifies the "well-established principle that, in exercising its equitable powers, a court 'cannot lawfully enjoin the world at large.'" *N.Y. v. Operation Rescue Nat'l*, 80 F.3d 64, 70 (2d Cir. 1996) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (Hand, J.)); *see also, e.g., United States v. Regan*, 858 F.2d 115, 120 (2d Cir. 1988) ("[A] court generally may not issue an order against a nonparty."). It is a basic rule of due process that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). As the Second Circuit has explained, a court is "not vested with sovereign powers to declare conduct unlawful; its jurisdiction is limited to those over whom it gets personal service, and who therefore can have their day in court." *Alemite*, 42 F.2d at 832-33. Thus, the "only occasion when a person not a party may be punished, is when he has helped to bring about, not merely what the decree has forbidden, because it may have gone too far, but what it has power to forbid, an act of a party." *Id.* at 833. Accordingly, Rule 65 mandates that an injunction can bind only a limited universe of people: (1) the parties; (2) their "officers, agents, servants, employees, and attorneys"; or

(3) those in "active concert or participation" with them. Fed. R. Civ. P. 65(d)(2); *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 112 (1969) ("[A] nonparty with notice cannot be held in contempt until shown to be in concert or participation.").

The "active concert or participation" standard is deliberately narrow. Its purpose is to ensure that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors[.]" *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *accord Alemite*, 42 F.2d at 833 ("[I]t is not the act described which the decree may forbid, but only that act *when the defendant does it.*") (emphasis added). The relationship between the party and the nonparty must be "that of associate or confederate." *Chase Nat'l Bank v. City of Norwalk, Ohio*, 291 U.S. 431, 436-37 (1934); *see also Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000) ("[A]ctive concert" requires a "close alliance with the enjoined defendant"). This ensures that "[a] nonparty who has acted independently of the enjoined defendant will not be bound by the injunction[.]" *Id.*

### B.   *Amici* and Other Service Providers Cannot Be Enjoined Because They Are Not in Active Concert with Defendants

Plaintiffs do not come close to meeting these bedrock Rule 65 requirements. The Neutral Service Providers are not parties to this action, nor are they officers, agents, servants, employees, or attorneys of the Defendants. The only way they could be bound by an injunction in this case is if they were found to be working "in active concert or participation" with the Defendants. But Plaintiffs have not made that showing as to any, much less all, of the *amici* or other providers they now seek to bind. It is telling in this regard that while certain portions of the proposed injunction include language that at least nods toward Rule 65's limitations (*see* Dkt. 12, ¶¶ 1, 5, 6, purporting to apply to "persons acting in concert or participation or in privity with" Defendants), the passages addressing the Neutral Service Providers omit such language altogether (*see id.* ¶¶ 1-4). Beyond that, neither the complaint nor the preliminary injunction motion offers

argument or evidence that any provider has worked as Defendants' associate or confederate or would be likely to help Defendants violate the terms of an injunction issued in this case.

In the absence of such evidence—which in order to satisfy due process would have to be presented in a proceeding where those entities were given an opportunity to be heard (*see generally Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950))—the Court cannot enter an order that purports to bind them. *See, e.g., Zenith Radio*, 395 U.S. at 112 ("It was error to enter the injunction against Hazeltine, without having made [the 'active concert or participation'] determination in a proceeding to which Hazeltine was a party."); *Bobolas v. Does*, No. CV-10-2056-PHX-DGC, 2010 U.S. Dist. LEXIS 110856, at *6-7 (D. Ariz. Oct. 1, 2010) ("Plaintiff's counsel argued that GoDaddy is an agent of Defendants given its role as website host and domain name registrar, but Plaintiff has made no such allegation in the complaint and provides no factual or legal proof on this point in its papers. As a result, the Court cannot enter a TRO against GoDaddy.").

Beyond this roadblock is an even more fundamental and substantive defect in Plaintiffs' proposed injunction. The intermediaries at issue here are not sufficiently connected to Defendants' alleged illegality to be subject to the Court's injunctive power. Consider, for example, the content delivery networks, web hosting providers, social media services, and online content services that Plaintiffs seek to enjoin. These entities provide an array of neutral services that enable Internet users of all stripes to store, index, disseminate, and promote an enormous amount of diverse information. Even assuming that Defendants have used these services in connection with their allegedly infringing activities, the providers still would not be "confederates" of the Defendants for purposes of Rule 65. The participation standard requires something more than including infringing websites among the mass of content that a service provider stores, provides access to, and allows its users to promote. Indeed, the Neutral Service

Providers are no more in "active concert" with Defendants than a utility company providing electricity to an infringing business, or the postal service carrying copies of infringing materials through the mails. *See, e.g.*, *Paramount Pictures Corp. v. Carol Publ'g Grp.*, 25 F. Supp. 2d 372 (S.D.N.Y. 1998) (book retailers not "in active concert" with infringing publisher by selling previously purchased copies of infringing book).

*Blockowicz v. Williams*, 630 F.3d 563 (7th Cir. 2010), is directly on point. In that case, the Seventh Circuit held that the operators of a nonparty website (Ripoff Report) could not be bound by an injunction against users of its service who posted defamatory comments. The court reached that conclusion even though Ripoff Report had a contractual agreement with the defendants governing their use of the website, and even though it continued to provide service to those defendants by leaving their material up on its website after the injunction had issued. *Id*. at 567-68. The plaintiffs "failed to present any evidence that [the website operators] had any contact with the defendants after the injunction was issued, or that they worked in concert with the defendants to violate the injunction." *Id*. As such, the conduct of Ripoff Report and its owners was "simply inadequate to render them aiders and abettors" for purposes of Rule 65. *Id*. at 568-70 ("Rule 65(d)(2)(C) is not broad enough to bind [the website operators] to the terms of this injunction in light of their inactivity.").

Plaintiffs' invocation of Rule 65 here fails for the same reason. Plaintiffs fail to show (or even allege) that *any* Neutral Service Provider has played an active and direct role in Defendants' allegedly infringing activities—much less that *all* of the intermediaries that would be swept up by the proposed injunction have done so. It is not enough that Defendants may have used some of the Neutral Service Providers' open and widely available services. As made plain in *Blockowicz*, even if Plaintiffs had shown that the Neutral Service Providers rendered services to the Defendants, merely continuing to provide those services cannot amount to "acting in concert." As a matter of law, the fact that a service provider "is technologically capable of removing the

postings does not render its failure to do so aiding and abetting." 630 F.3d at 568. As in *Blockowicz*, therefore, "Rule 65(d)(2)(C) is not the appropriate mechanism for achieving the removal of the [D]efendants' posts." *Id*. at 569.

    C.    <u>The Orders Plaintiffs Cite Do Not Authorize An Injunction Against The Neutral Service Providers Here</u>

Trying to extend the injunction beyond what Rule 65 allows, Plaintiffs cite two recent rulings from this District, but neither of those cases supports the broad preliminary order they are seeking here.

Plaintiffs first refer to *Arista Records LLC v. Tkach*, No. 15-cv-3701-AJN, Dkt. 58 (S.D.N.Y. June 3, 2015), which held that a permanent injunction, issued after a summary judgment ruling against an infringing website, could apply to CloudFlare—a nonparty service provider that contracted with the website's owners to translate the websites' domain names into IP addresses and to provide optimization services to those sites. While *amici* respectfully disagree with Judge Nathan's ruling, nonetheless it is readily distinguishable. The ruling in *Tkach* involved a single nonparty service and a detailed factual record describing its relationship with the infringing defendant after the entry of summary judgment—not a request to bind the entire Internet at the very outset of a case. To that end, the key point emphasized by the court was that CloudFlare had entered into an agreement to start providing services to the defendants only *after* it had received notice of the injunction. *Id*. at 6-8. Moreover, CloudFlare did not just provide passive hosting; it actively serviced defendants' websites by (i) ensuring that their IP addresses remained linked to their domain names and (ii) optimizing their performance for faster load times. *Id.*

Even assuming these considerations are meaningful under Rule 65, they only confirm that an injunction against innumerable Neutral Service Providers would not be appropriate here. As explained above, there is no evidence (or even an allegation) of a contractual relationship between Defendants and any nonparty intermediary—and

certainly not a relationship that was formed after the entry of an injunction against those Defendants. That by itself makes *Tkach* inapplicable. Beyond that, Plaintiffs have offered nothing to suggest that the Neutral Service Providers play an active role in aiding or abetting Defendants' allegedly infringing activities. The most that could be gleaned from Plaintiffs' papers is that some providers may offer the same services to Defendants that they provide to millions of other websites and users. That is not enough. Even under *Tkach's* reasoning, a service provider does not engage in "active concert" simply by continuing to operate its service as it was prior to an injunction being issued against a given defendant. *See Blockowicz*, 630 F.3d at 567-69. Something more is required, and Plaintiffs have made no showing that it exists here.[2]

*The North Face Apparel Corp. v. Fujian Sharing Import & Export Ltd.*, No. 10-cv-1630-AKH, Dkt. 56 (S.D.N.Y. June 24, 2011), is even more clearly inapposite. There, Judge Hellerstein considered whether to hold a nonparty domain name registrar, Public Interest Registry ("PIR"), in contempt for refusing to abide by the court's prior order to disable access to websites that sold counterfeits of plaintiffs' goods. As an initial matter, the court's statements that Plaintiffs rely on are pure dicta. The actual holding in that case was to *deny* the plaintiffs' motion to hold PIR in contempt. As Judge Hellerstein explained, "[b]ecause Public Interest Registry was not joined as a party in the underlying lawsuit, ... [the court] lacked the authority to order Public Interest Registry affirmatively to act, i.e., to disable or otherwise render inactive defendants' infringing domain names and transfer them to plaintiffs' ownership and control." *Id.* at 4. Accordingly, the relief that Plaintiffs seek here is precisely what the court in *North Face* held to be impermissible.

---

[2] Judge Nathan also did not address the independent barrier that the DMCA safe harbors pose to the preliminary injunction that Plaintiffs seek here. *See infra* at 12-17.

Having denied the plaintiffs' bid to bind a nonparty service provider based on its actions before the entry of an injunction against the named defendants, Judge Hellerstein did suggest, in dicta, that by continuing to "make the connections that enable customers attracted to defendants' websites to access those websites," PIR might be found to be aiding and abetting the defendants' violation of a permanent injunction. *Id.* at 4-6. While *amici* disagree with this dicta (and there is no indication that PIR was ever actually held in contempt), it has little bearing on this case. *North Face* involved a narrow factual inquiry regarding the relationship between the defendants and a particular service provided by a top-level domain name registry. Here, by contrast, Plaintiffs are not seeking a targeted injunction against a particular service provider with a demonstrated relationship with an adjudicated infringer. Instead, they seek an indiscriminate, preemptive, preliminary injunction against virtually every category of online intermediary—all with no showing of the relationship between any of those services and Defendants' allegedly infringing activities. Plaintiffs' proposed injunction goes far beyond anything contemplated in *North Face*, *Tkach*, or indeed any other case of which *amici* are aware.[3] As in *Tkach*, moreover, Judge Hellerstein had no occasion in *North Face*, which was not a copyright case, to consider the limits on permissible injunctive relief imposed by the DMCA. *See infra* at 12-17. Nor did he address, or even mention, the Seventh Circuit's decision in *Blockowicz*, which as discussed above, is the most direct and authoritative ruling on when an online service provider can be bound by an injunction in a case to which it is not a party.

---

[3] Plaintiffs mention several other cases in which preliminary injunctions were issued that purported to bind nonparty online service providers. Dkt. 24, at 22-23 & n.46. But those *ex parte* orders all were issued without any opposition from the named defendants (much less the affected nonparties), and so none of those courts considered the serious legal shortcoming of such injunctions. Nor is there any indication that any of those orders was ever actually applied or enforced against such a nonparty intermediary. These unopposed and untested orders thus provide no guidance to the Court in this case and no support for Plaintiffs' position.

* * *

An injunction cannot apply to "independent action taken by nonparties on their own behalf." *Carol Publ'g*, 25 F. Supp. 2d at 375. That is the situation here. Under Rule 65, the Neutral Service Providers must be excluded from the preliminary injunction sought by Plaintiffs in this case.

## II.   Plaintiffs Cannot Circumvent the DMCA by Seeking Broad *Ex Parte* Injunctive Relief Against the Neutral Service Providers

Plaintiffs' requested injunction against nonparty intermediaries runs into another obstacle: the DMCA safe harbors. The DMCA imposes strict limits on the injunctions that can be issued against online service providers—*even after they have been found liable for copyright infringement*. The DMCA expresses Congress's intention that concerns about infringement on the Internet be resolved primarily through voluntary cooperation between service providers and copyright owners, not by broad court orders issued against the entire Internet without notice. It cannot be that remedies prohibited even after a finding of copyright liability against an infringing party could be available via a preliminary injunction against an innocent nonparty.

### A.   The DMCA Protects Online Service Providers Against Copyright Liability and Strictly Limits the Injunctions That Can Be Imposed

The DMCA was enacted in 1998 to "update domestic copyright law for the digital age." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26-27 (2d Cir. 2012). A key part of that project was to "'clarif[y] the liability faced by service providers who transmit potentially infringing material over their networks.'" *Id.* at 27 (quoting S. REP. NO. 105-190, at 2 (1998)). Congress recognized that "in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability." S. REP. NO. 105-190, at 8. By limiting providers' "legal exposure for infringements that may occur in the course of their activities" (*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007)

(internal marks and citation omitted)), the "DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand" (S. REP. NO. 105-190, at 8).

To that end, Congress created a series of "'safe harbors'[] for certain common activities of service providers." S. REP. NO. 105-190, at 19. The safe harbors "allow qualifying service providers to limit their liability for claims of copyright infringement based on (a) 'transitory digital network communications,' (b) 'system caching,' (c) 'information residing on systems or networks at [the] direction of users,' and (d) 'information location tools.'" *Viacom*, 676 F.3d at 27 (quoting 17 U.S.C. § 512(a)-(d)). The DMCA safe harbors offer far-reaching protection: "A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j)." *Perfect 10*, 508 F.3d at 1158; *see also* S. REP. NO. 105-190, at 52-53 (Section 512(j) expressly "limits the scope of injunctive relief that may be ordered against a qualifying provider").

This means that *even if a qualifying online service provider is found liable for infringement*, the only remedies available to the plaintiff are those permitted by the DMCA. S. REP. NO. 105-190, at 40 (explaining that the DMCA's "limitations of liability apply if the provider is found to be liable under existing principles of law"). The DMCA thus puts bedrock limits on the injunctions that can be imposed on qualifying providers (such as *amici* and many of the other Neutral Service Providers) if they are named as defendants and are held liable as infringers. *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("Congress intended the DMCA's safe harbor for ISPs to be a floor, not a ceiling, of protection.").[4]

---

[4] Likewise, the DMCA's provisions limiting injunctive relief supplement the ordinary rules governing injunctions. *See* S. REP. NO. 105-190, at 52 (section 512(j) "defines the terms and conditions under which an injunction may be issued against a service provider" that is "otherwise subject to an injunction under existing principles of
(continued...)

The DMCA provides that a "court may grant injunctive relief with respect to a service provider *only* in one or more" of the forms set out in the statute. 17 U.S.C. § 512(j)(1) (emphasis added). That ensures that any injunction issued against a service provider covered by the Section 512(b), (c), or (d) safe harbors focuses narrowly on "material or activity residing at a particular online site" (§ 512(j)(1)(A)(i)), and is the "least burdensome to the service provider among the forms of relief comparably effective for that purpose" (§ 512(j)(1)(A)(iii)). For providers covered by Section 512(a), which include those who transmit material over the Internet or provide connections to websites, Congress imposed even more stringent limits. § 512(j)(1)(B). Any order directed at such providers in a case involving a foreign website must specify "reasonable steps" for the provider to take to block access "to a specific, identified, online location outside the United States." § 512(j)(1)(B)(ii).

To further protect the interests and operations of service providers, Section 512(j)(2) "identifies factors a court *must consider* in deciding whether to grant injunctive relief and in determining the appropriate scope of injunctive relief." S. Rep. No. 105-190, at 53 (emphasis added). Those include:

- "whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network" (§ 512(j)(2)(A)); and

- "whether other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available" (§ 512(j)(2)(D)).

Beyond all that, subsection (j) includes a vital procedural protection: "[i]njunctive relief under this subsection shall be available *only after notice to the service provider and an*

_____

(...continued from previous page)
law"). They thus provide an additional set of procedural and substantive protections to service providers beyond, for example, the limits imposed by Fed. R. Civ. P. 65.

-14-

*opportunity for the service provider to appear are provided*[.]" § 512(j)(3) (emphasis added). This provision "prohibits most forms of ex parte injunctive relief (including temporary and preliminary relief) against a service provider qualifying for a liability limitation under section 512." S. REP. NO. 105-190, at 53.

    B.   <u>Plaintiffs' Requested Injunction Would Be Improper Even If the Neutral Service Providers Were Culpable Defendants</u>

    Plaintiffs appear to have ignored all these statutory limitations. Their proposed injunction does not even acknowledge the DMCA's procedural and substantive requirements. Indeed, what Plaintiffs are seeking (through a preliminary injunction against nonparties) goes beyond what Congress was willing to permit even against service providers against whom a final judgment of infringement has been entered. Plaintiffs' effort to circumvent the DMCA should be rejected.

    *Amici,* and many of the other Neutral Service Providers targeted by Plaintiffs' proposed injunction, are all "service providers" that qualify for the protections of the DMCA. 17 U.S.C. § 512(k)(1); *accord Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744 (S.D.N.Y. 2012) ("The DMCA's definition of 'service provider' is intended to encompass a broad set of Internet entities."), *aff'd*, 569 Fed. Appx. 51 (2d Cir. 2014). They perform various functions covered by the safe harbors. "[S]earch-based online advertising services" identified in the proposed injunction (Dkt. 12, ¶ 4) provide "information location tools" that are protected by the Section 512(d) safe harbor. S. REP. NO. 105-190, at 47 ("The term information location tools includes, for example: a directory or index of online sites or material such as a search engine that identifies pages by specified criteria[.]"). "[W]eb hosting providers," "social media services," and "user generated and online content services" (Dkt. 12, ¶ 4) store material uploaded by users (covered by the Section 512(c) safe harbor) and/or transmit information across their networks (covered by the Section 512(a) safe harbor). *See Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010) ("YouTube is a service provider

for purposes of § 512(c)."), *aff'd in part, vacated in part*, 676 F.3d 19 (2d Cir. 2012); S. REP. No. 105-190, at 43 (examples of online "storage" covered by 512(c) include "providing server space for a user's web site"); *id*. at 41 (Section 512(a) applies to "communications functions associated with sending digital communications of others across digital networks, such as the Internet and other online networks"). Accordingly, had the Neutral Service Providers been found liable for copyright infringement for linking to, hosting, or transmitting infringing material from Defendants' site, any injunction issued against them would have to conform to the requirements of 17 U.S.C. § 512(j).

Plaintiffs' proposed injunction departs from those limitations in various ways. The *ex parte* relief that Plaintiffs seek is expressly forbidden by the DMCA. Plaintiffs' failure to provide notice to any of the potentially affected service providers rules out any injunction against them. S. REP. No. 105-190, at 53. Nor do Plaintiffs even try to make the showing that would be necessary for the Court to "consider" the various factors it must address under the statute. Plaintiffs offer no evidence (or even argument) that requiring the Neutral Service Providers to act "would be technically feasible and effective, and would not interfere with access to noninfringing material at other online locations[.]" § 512(j)(2)(C). Nor do they say anything about the "burden" the injunction would impose (§ 512(j)(2)(A)) or whether "other less burdensome and comparably effective means of preventing or restraining access to the infringing material are available" (§ 512(j)(2)(D)). Plaintiffs certainly have made no showing that the relief they seek is "the least burdensome to the service provider among the forms of relief comparably effective for that purpose" (§ 512(j)(1)(A)(iii)), and their proposed injunction does not specify "reasonable steps" that service providers transmitting material over the Internet can take to block access "to a specific, identified, online location outside the United States" (§ 512(j)(1)(B)(ii)).

Beyond all that, however, is a more basic flaw. The DMCA's limits on injunctions presuppose that the service provider will have been named as a defendant and actually

found liable for infringement. But nothing like that has happened here. Plaintiffs do not suggest that any of the Neutral Service Providers has engaged in any infringing conduct, much less come forward with evidence to support such a claim. Nevertheless, they seek a preliminary injunction that targets these providers by name and would conscript them into Plaintiffs' efforts to eradicate Defendants' allegedly infringing activities across the entire Internet. While *amici* take no view as to the merits of Plaintiffs' requested relief against the Defendants, their request as against *amici* is not permitted. Given that the DMCA imposes significant procedural and substantive limits on the injunctions available against online service providers that are actually liable for infringement, the statute necessarily rules out enjoining providers who are innocent of any even accused wrongdoing. Copyright plaintiffs certainly cannot obtain injunctions against service providers *as nonparties* that would be barred by the DMCA had those same providers been adjudicated as *culpable defendants.* But Plaintiffs here seek just such a logic-defying result—one that would be at odds with the balanced statutory regime that Congress created.

## III.    Plaintiffs Cannot Use the All Writs Act to Bind Nonparty Service Providers

Plaintiffs also cannot justify their request for an order binding nonparty service providers using the All Writs Act. *See* Dkt. 24, at 21. The All Writs Act is a narrow gap-filling provision. It is "reserved for really extraordinary causes, such as a clear abuse of discretion or usurpation of judicial power." 21A Karl Oakes, *Fed. Proc., L. Ed.* § 51:208 (2015 ed.) (footnotes omitted). The Act does not apply here.

### A.    The All Writs Act is a Narrow Gap-Filling Provision That Cannot Displace Other Laws and Cannot Be Used to Burden Third Parties

Enacted in 1789, the All Writs Act authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). It is designed to fill "the interstices of federal judicial power when those gaps threatened to thwart the otherwise proper

exercise of federal courts' jurisdiction." *Pa. Bureau of Correction v. United States Marshals Serv.*, 474 U.S. 34, 41 (1985). Although the All Writs Act is flexible, there are several important limitations on how and when it can be applied.

*First*, any order issued under the Act must aim narrowly at protecting *the court's* jurisdiction. "The Supreme Court has been careful to limit the All Writs Act to cases in which the requested relief is necessary to give effect to an order that the court is authorized to grant, *i.e.*, to cases in which the court could not otherwise discharge its assigned duties." *Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1396 (Fed. Cir. 1996); *see also, e.g.*, *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) ("[C]onduct not shown to be detrimental to the court's jurisdiction or exercise thereof could not have been enjoined under the Act."). Without a clear nexus to a court's jurisdiction, the fact that a *party* may be aided in enforcing its rights by an order is not sufficient. The All Writs Act is not "a mechanism for the judiciary to give [a party] the investigative tools that Congress has not." *In re An Application of the United States for an Order Authorizing the Use of a Pen Register*, 396 F. Supp. 2d 294, 325 (E.D.N.Y. 2005).

*Second*, while there is no *per se* rule against using the Act to bind a third party, "the assistance of the third party must be absolutely necessary." *United States v. Hall*, 583 F. Supp. 717, 719 (E.D. Va. 1984):

> [T]he extraordinary remedy of enjoining non-parties must be reserved for extraordinary cases, in which the activities of third parties threaten to undermine the court's ability to render a binding judgment in the case before it. Nothing … suggests that the All Writs Act can be employed as a general license for district courts to grant relief against non-parties whenever such measures seem useful or efficient.

*Additive Controls*, 96 F.3d at 1396.

*Third*, the Act does not allow courts "to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pa. Bureau*, 474

U.S. at 43. Thus, where, as here, "a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling." *Id.*; *see also, e.g.*, *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28 (2002) (holding that the Act may not be used to remove cases from state court where that is not authorized by the statute specifically governing removal). Nor can the Act override constitutional protections. *In re An Application of the United States for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 581-83 (D. Md. 2011) ("The government simply cannot use the All Writs Act to circumvent the requirements of the Fourth Amendment[.]").

     B.    <u>The All Writs Act Does Not Authorize an Injunction Here</u>

Plaintiffs' invocation of the All Writs Act exceeds these limits. Most obviously, the Act does not permit Plaintiffs to circumvent Rule 65 and the DMCA. "While the All Writs Act empowers a district court to fashion extraordinary remedies when the need arises, it does not authorize a district court to promulgate an ad hoc procedural code whenever compliance with the Rules proves inconvenient." *Fla. Med. Ass'n, Inc. v. United States Dep't of Health, Educ. and Welfare*, 601 F.2d 199, 202 (5th Cir. 1979) ("[T]he All Writs Act does not free a district court from the restraints of Rule 65."). For a court to impose injunctive relief that is specifically forbidden by the Rules of Civil Procedure and the federal copyright laws would exceed the limited role of the All Writs Act. Just as parties "may not, by resorting to the All Writs Act, avoid complying with the statutory requirements for removal" (*Syngenta*, 537 U.S. at 32-33), rightsholders may not invoke the Act as an end-run around the statutory requirements for obtaining injunctions against online service providers.

Moreover, an order binding the Neutral Service Providers is not necessary to protect the court's jurisdiction. While the All Writs Act can be used to prevent third parties from "frustrat[ing] the implementation of a court order" (*United States v. N.Y.*

*Tel. Co.*, 434 U.S. 159, 174 (1977)), that is not broad license to issue third-party writs whenever it might assist a party in obtaining relief. Such orders must be tailored to "preserve the court's ability to reach or enforce its decision" as against "non-parties whose actions would impair the court's jurisdiction[.]" *In re Baldwin-United Corp.*, 770 F.2d 328, 338-39 (2d Cir. 1985). Here, requiring *amici* to act against Defendants' websites would not "curb conduct which threaten[s] improperly to impede or defeat the subject matter jurisdiction then being exercised by the court." *ITT Cmty.*, 569 F.2d at 1359. Even if such an order helped Plaintiffs protect their intellectual property, "'[t]he fact that a party may be better able to effectuate its rights or duties if a writ is issued never has been, and under the language of the statute cannot be, a sufficient basis for issuance of the writ.'" *Id*. at 1360 (quoting *N.Y. Tel.*, 434 U.S. at 189 (Stevens, J., dissenting)).

Finally, the assistance of the Neutral Service Providers is not "absolutely necessary" to effectuate any injunction the Court might issue in this case. *Hall*, 583 F. Supp. at 719. In approving a third-party writ in *New York Telephone*, the Supreme Court emphasized "that without the Company's assistance there is no conceivable way in which the surveillance authorized by the District Court could have been successfully accomplished." 434 U.S. at 175. Here, by contrast, there is no technological reason why an injunction against the Defendants alone would not be fully enforceable.

C.    The Court Should Not Use the All Writs Act to Resurrect SOPA

Plaintiffs' reliance on the All Writs Act is especially problematic because it seeks to duplicate the broad authority that Congress considered, but ultimately abandoned, in the ill-fated 2012 SOPA proposal. That bill would have authorized actions against foreign websites engaged in intellectual property infringement in which the Attorney General could have obtained broad injunctions against various online intermediaries, including, for example, requiring search engines to take measures "to prevent the

-20-

foreign infringing site that is subject to the order, or a portion of such site specified in the order, from being served as a direct hypertext link." H.R. 3261, § 102(c)(2)(B).

Congress's effort to expand copyright owners' remedies in this way was met with a public outcry that recognized the dangers such blocking orders posed for the Internet. *See, e.g.*, David Carr, *The Danger Of an Attack on Piracy Online*, N.Y. Times, Jan. 1, 2012, *available at* http://www.nytimes.com/2012/01/02/business/media/the-danger-of-an-attack-on-piracy-online.html (reporting that "the Web is starting to come alive with opposition—nearly 90,000 Tumblr users have phoned members of Congress and more than a million people have signed an online petition protesting the legislation," and that "Laurence H. Tribe, the noted First Amendment lawyer, said in an open letter on the Web that SOPA would 'undermine the openness and free exchange of information at the heart of the Internet.'"). In response to this criticism, SOPA and its companion bill were shelved. *See* Jonathan Weisman, *After an Online Firestorm, Congress Shelves Antipiracy Bills*, N.Y. Times, Jan. 20, 2012, *available at* http://www.ny times.com/2012/01/21/technology/senate-postpones-piracy-vote.html.

Plaintiffs now appear to be repackaging the excesses of SOPA into the All Writs Act. Indeed, the injunction proposed here would require the same online intermediaries targeted by SOPA to engage in the same kind of content and domain blocking that would have been required under SOPA had it been enacted. *See, e.g.*, Gardner, *MPAA Testing the Limits of Pirate Site Blocking in MovieTube Lawsuit*, *supra* at 3. The Court should not allow intellectual property rightsholders to obtain through the existing statutes the very sort of third-party blocking orders that failed to gain legislative approval. That effort is particularly inappropriate in connection with the All Writs Act, a gap-filling provision that has nothing to do with intellectual property or the Internet, and that is merely a "residual source of authority to issue writs that are not otherwise covered by statute." *Pa. Bureau*, 474 U.S. at 43.

## CONCLUSION

For these reasons, *amici* ask the Court to strike all language from Plaintiffs' proposed preliminary injunction which purports to bind nonparties that are not "acting in concert or participation" with Defendants—including *amici* and other Neutral Services Providers that are merely "providing services used in connection with Defendants' operations." *Amici* also respectfully request that the Court issue an order that would provide guidance to future courts faced with improper requests for injunctions against nonparty Internet intermediaries.

Dated:  August 10, 2015                    Respectfully submitted,

                                           s/ *Brian M. Willen*
                                           Brian M. Willen
                                           Jason B. Mollick
                                           WILSON SONSINI GOODRICH & ROSATI, P.C.
                                           1301 Avenue of the Americas, 40th Floor
                                           New York, New York 10019
                                           Phone: (212) 999-5800
                                           Fax: (212) 999-5899
                                           Email: bwillen@wsgr.com
                                           Email: jmollick@wsgr.com

                                           *Counsel for Amici Curiae*