**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PARAMOUNT PICTURES CORPORATION; WARNER BROS. ENTERTAINMENT INC.; TWENTIETH CENTURY FOX FILM CORPORATION; COLUMBIA PICTURES INDUSTRIES, INC.; UNIVERSAL CITY STUDIOS LLC; UNIVERSAL STUDIOS HOME ENTERTAINMENT LLC; and DISNEY ENTERPRISES, INC., <br><br>                     Plaintiffs, <br><br>     v. <br><br>JOHN DOES, JANE DOES and/or XYZ CORPORATIONS d/b/a MOVIETUBE; and JOHN DOES, JANE DOES and/or XYZ CORPORATIONS 2-100, <br><br>                     Defendants. | **CIVIL ACTION NO. 15-CV-5819 (PAC)** <br><br> **AFFIDAVIT  IN SUPPORT OF ORDER TO SHOW CAUSE FOR DEFAULT JUDGMENT AND PERMANENT INJUNCTION** |

STATE OF NEW YORK        )
                           ) ss:
COUNTY OF NEW YORK     )

     G. Roxanne Elings, being duly sworn, deposes and says:

     1.     I am an attorney licensed to practice law in the State of New York and before the

bar of the Southern District of New York.  I am a partner with the law firm of Davis Wright

Tremaine LLP ("DWT"), counsel to the Plaintiffs Paramount Pictures Corporation

("Paramount"); Warner Bros. Entertainment Inc. ("WBEI"); Twentieth Century Fox Film

Corporation ("Fox"); Columbia Pictures Industries, Inc. ("CPII"); Universal City Studios LLC;

Universal Studios Home Entertainment LLC (collectively with Universal City Studios LLC,

"Universal"); and Disney Enterprises, Inc. ("DEI," and collectively with Paramount, WBEI, Fox,

CPII, and Universal, "Plaintiffs").  As such, I am familiar with the facts surrounding the

circumstances discussed herein based on my review of the records kept by DWT in the normal course of business.

2.      I submit this affidavit in support of Plaintiffs' Order to Show Cause for Default Judgment and Permanent Injunction against all defendants in this action, namely: Defendants John Does, Jane Does and/or XYZ Corporations d/b/a MovieTube; and John Does, Jane Does and/or XYZ Corporations 2-100 (collectively, "Defendants" and "Defaulting Defendants" and each, individually, a "Defaulting Defendant") pursuant to Fed. R. Civ. P. 55(b)(2).  No prior application for this relief has been made.  To Plaintiffs' knowledge, Defendants are not infants, incompetents, or in the military.

## I.      INTRODUCTION

3.      Defendants owned and operated a ring of at least twenty-nine (29) interconnected video-on-demand websites under the MovieTube brand name and logo (the "MovieTube Websites") where they streamed, and in some cases allowed downloading of, unauthorized copies (the "Infringing Copies") of Plaintiffs' numerous motion pictures and/or television programs ("Plaintiffs' Works").  Defendants profited handsomely from the MovieTube Websites through their partnership with multiple advertising networks that pay based on website traffic, as evidenced by the MovieTube Websites attracting over 81 million visits in a single month.[1] Defendants knew their activities on the MovieTube Websites were illegal, boasting that they "do not need to respect US laws" because "they are not a US company."[2]  Defendants took steps to conceal their identity, including providing false WHOIS registration information for the domain names, failing to list any physical contact information on the MovieTube Websites and failing to appear in this action.

---

[1] Declaration of Farnaz M. Alemi, dated July 23, 2015 [Doc. No. 16] ("Alemi Decl.") ¶ 22, Ex. E.
[2] Alemi Decl. ¶ 31, Ex. I.

4.      Plaintiffs are entitled to a default judgment based on well-pled allegations in the Complaint, as well as statutory damages and a permanent injunction.

## II.      RELEVANT FACTS

### A.      Plaintiffs' Copyrights And Trademarks

5.      Plaintiffs, directly or through their affiliates, are among the leading motion picture studios responsible for the creation and distribution of some of the world's most popular motion picture and television entertainment.[3]  Plaintiffs own and/or control the copyrights and/or the relevant exclusive rights under United States copyright law ("Plaintiffs' Copyrights") in numerous motion pictures and/or television program works ("Plaintiffs' Works").[4]

6.      Plaintiffs, either on their own or in conjunction with their affiliates, have the exclusive rights in the United States to, among other things, reproduce, distribute, publicly perform, or display publicly, Plaintiffs' Works, including through digital streaming services, cable and satellite television providers, and pre-recorded DVDs and Blu-ray discs.[5]

7.      Plaintiffs are also the proprietors of some of the most well-known and well-regarded brands in the world including, but not limited to, PARAMOUNT®, WARNER BROS®, TWENTIETH CENTURY-FOX®, COLUMBIA PICTURES®, UNIVERSAL® and WALT DISNEY® (collectively with other related word and design marks, "Plaintiffs' Marks"), which have long been used by Plaintiffs in conjunction with the distribution of Plaintiffs' Works.[6] Plaintiffs' Marks are widely promoted, both in the United States and throughout the world and,

---

[3] Compl. ¶ 21; Declaration of Kevin Suh, dated July 23, 2015 [Doc. No. 22] ("Suh Decl.") ¶ 3; Declaration of David Phillip Kaplan, dated July 14, 2015 [Doc. No. 18] ("Kaplan Decl.") ¶ 4; Declaration of Daniel Kim, dated July 16, 2015 [Doc. No. 19] ("Kim Decl.") ¶ 3; Declaration of Michael Stanton, dated July 16, 2015 [Doc. No. 21] ("Stanton Decl.") ¶ 4; Declaration of Karen Garver, dated July 21, 2015 [Doc. No. 17] ("Garver Decl.") ¶ 4; Declaration of Marsha L. Reed, dated July 15, 2015 [Doc. No. 20] ("Reed Decl.") ¶ 3.
[4] Compl. ¶ 22, Ex. A; Suh Decl. ¶ 4, Ex. A; Kaplan Decl. ¶ 5, Ex. A; Kim Decl. ¶ 4, Ex. A; Stanton Decl. ¶ 5, Ex. A; Garver Decl. ¶ 5, Ex. A; Reed Decl. ¶ 4, Ex. A.
[5] Suh Decl. ¶ 5; Kaplan Decl. ¶ 6; Kim Decl. ¶ 4; Stanton Decl. ¶ 6; Garver Decl. ¶ 6; Reed Decl. ¶ 5.
[6] Compl. ¶ 23, Ex. B; Suh Decl. ¶¶ 6-8, Ex. B; Kaplan Decl. ¶¶ 7-9, Ex. B; Kim Decl. ¶¶ 5-7, Ex. B; Stanton Decl. ¶¶ 7-9, Ex. B; Garver Decl. ¶¶ 7-9, Ex. B; Reed Decl. ¶¶ 6-8, Ex. B. Plaintiffs' Marks are the subject of numerous valid and subsisting United States registrations, many of which have become incontestable. *Id.*

DWT 28178396v6 0067328-000013

as a result, consumers, potential consumers, and members of the general public alike recognize that copies of Plaintiffs' Works bearing Plaintiffs' Marks originate exclusively with Plaintiffs.[7]

**B.**     **Defaulting Defendants' Infringing Activities**

8.     Defendants, through the MovieTube Websites, streamed Infringing Copies of Plaintiffs' Works[8] through either (i) video player software supplied by and built into the MovieTube Websites; and/or (ii) frames of third-party video players.[9]  Either way, users could watch Infringing Copies without leaving the MovieTube Websites.[10]  The MovieTube Websites also allowed users, in some instances, to download Infringing Copies by clicking on a selection from a menu built into the video player software.[11]  Defendants selected, organized and promoted the content streamed via the MovieTube Websites and did not allow users to make additions or changes to these "closed" websites.[12]

9.     Defendants advertised and marketed their offerings of Infringing Copies, including by curated browsable categories and indexes of genres (*e.g.*, comedy, action, drama, etc.).[13]  Each of the Infringing Copies was accompanied by the corresponding work's name, principal cast and director, plot synopsis, IMDB rating, a promotional poster or "key art", and/or a playable preview video.[14]

10.     Defendants generated revenue through the display of digital advertisements[15] served by advertising networks AdCash, Propeller Ads Media, MGID, Matomy Media Group

---

[7] Suh Decl. ¶¶ 9-10; Kaplan Decl. ¶¶ 10-11; Kim Decl. ¶¶ 8-9; Stanton Decl. ¶¶ 10-11; Garver Decl. ¶¶ 10-11; Reed Decl. ¶¶ 9-10.
[8] Compl. ¶ 25; Alemi Decl. ¶ 6.
[9] Compl. ¶ 25; Alemi Decl. ¶ 8-9.
[10] Compl. ¶ 25; Alemi Decl. ¶ 10.
[11] Compl. ¶ 25; Alemi Decl. ¶¶ 11, 16.
[12] Compl. ¶ 26; Alemi Decl. ¶¶ 6, 13.
[13] Compl. ¶ 28; Alemi Decl.¶ 14.
[14] Compl. ¶ 28; Alemi Decl. ¶ 6.
[15] The digital advertisements are either pop-up advertisements that open in a new window or tab, or they are frame or display advertisements that appear on the website itself. *Id.* at 7, n.2.

and Hyuna.[16]   To increase advertising revenues, Defendants actively drove visitor traffic to the MovieTube Websites through various means including the: (i) promotion of the MovieTube Websites and Infringing Copies on their social media accounts such as Facebook and Twitter ("Defendants' Social Media Accounts"); (ii) embedded Facebook user comments on the MovieTube Websites and within the content; and (iii) the promotion of the MovieTube Websites through the use of meta-tags and keywords designed to maximize the MovieTube Websites' visibility and priority in Internet search engines results.[17]   For example, the meta-tag for "description" in the source code of each MovieTube Website reads: "MovieTube is the No.1 site to watch newly released movies and television series.  It has the largest movie database, fastest streaming speed, and it's 100% free!"[18]   Defendants' promotion included the use of searchable keywords to describe the Infringing Copies as "Newly Released," in "HD," "In Cinema" or "Newly Added," as shown below:[19]



---

[16] Compl. ¶ 29; Alemi Decl. ¶ 18, Ex. A.
[17] Compl. ¶¶ 27-31; Alemi Decl. ¶¶ 18-21, Exs. C-D.
[18] Compl. ¶ 31; Alemi Decl. ¶ 21, Ex D.
[19] Compl. ¶ 31; Alemi Decl. ¶ 15, Ex. A.

11.     Defendants' aggressive promotion and search-engine optimization of the MovieTube Websites permitted them to profit off their blatantly infringing activities.  Just prior to filing this action, Defendants, in one month, attracted over 81 million estimated visits to the MovieTube Websites, including almost 61 million visits from users in the United States.[20]  Defendants' advertising-based revenue model would have yielded them significant profits given their high traffic, little to no overhead, and the fact that, unlike legitimate digital content services, they paid not a single dollar to license the content on their websites.[21]

12.     Defendants are aware that these activities are illegal.  On their Facebook page, Defendants admitted that many of their offerings are "pirated movies."[22]  Defendants also admitted that the MovieTube Websites' video players "link[] [to] those movies, so [they] have partial responsibility called 'Copyright Infringement' according [to] US law."  Defendants then took the position they are beyond United States law, stating, "Luckily we are not a US company *so we do not need to respect US laws.*"[23]

13.     Defendants have not received a license, authorization, permission or consent to reproduce, distribute, publicly perform or display any of Plaintiffs' Works.[24]  Defendants are not authorized to use any of Plaintiffs' Marks.[25]

**1.      Defendants Commonly Own And Control The MovieTube Websites**

14.     The MovieTube Websites were operated by Defendants likely from Singapore and were located at the following domains: MovieTube.tw, MovieTube.ph, TVStreaming.cc, MovieTube.sx, MovieTube.pw, MovieTubenow.com, MovieTube.tf, MovieTube.co,

---

[20] *Id.* ¶ 22, Ex. E.
[21] *Id.* ¶ 12; *see also* Compl. ¶¶ 29-30, 48.
[22] Alemi Decl. ¶ 31, Ex. I.
[23] *Id.* (emphasis added).
[24] Suh Decl. ¶ 13; Kaplan Decl. ¶ 14; Kim Decl. ¶ 12; Stanton Decl. ¶ 14; Garver Decl. ¶ 14; Reed Decl. ¶ 11; *see also* Compl. ¶ 64.
[25] Suh Decl. ¶ 13; Kaplan Decl. ¶ 14; Kim Decl. ¶ 12; Stanton Decl. ¶ 14; Garver Decl. ¶ 14; Reed Decl. ¶ 11; *see also* Compl. ¶ 64.

MovieOnDrive.com, MovieTube.vc, TuneVideo.net, MovieTube.mn, MovieTube.cc,

Watch33.tv, MovieTube.cz, Anime1.tv, MovieTube.pm, FunTube.co, MovieTube.la,

KissDrama.net, MovieTube.so, MovieTube.click, MovieTubeHD.co, MovieTubeHD.net,

MovieTubeHD.org, MovieTubeHD.tv, MovieTubeHD.us, MovieTubenow.in, and

TuneMovie.me.[26]  Defendants claimed common ownership of the MovieTube Websites through

the use of the MovieTube brand name and  logo.[27]  In addition, on each of the MovieTube

Websites, Defendants linked to other MovieTube Websites and advised users to choose other

MovieTube Websites purportedly hosted by a server located in a country near the user's

location:[28]



15.  Defendants' common ownership and control of the MovieTube Websites is also

evidenced by: identical and similar WHOIS domain registration information for the domain

names of the websites; common design and layout; common meta-tags in the source code; a

shared unique identification number with an advertising service provider used by the MovieTube

Websites; and common linking to a MovieTube App page.[29]

### 2.  Defendants' Use Of False Identities And Attempts To Avoid Detection And Enforcement

16.  The MovieTube Websites were devoid of any identifiable names or real

addresses, and Defendants communicated with potential users through Defendants' Social Media

---

[26] Alemi Decl. ¶¶ 7, 27, Ex. G; ; *see also* Compl. ¶ 15.
[27] Compl. ¶ 32; Alemi Decl. ¶ 23, Ex. A.
[28] Alemi Decl. ¶ 23, Ex. A.
[29] Compl. ¶ 33; Alemi Decl. ¶ 24.

Accounts or email, without revealing their true identities.[30]  The Internet Corporation for Assigned Names and Numbers ("ICANN"), the body that governs domain names, has adopted the Uniform Domain Name Dispute Resolution Policy (the "ICANN Policy"), which requires each registrant of a domain name to provide complete and accurate information to identify the registrant.  Despite ICANN Policy, Defendants' WHOIS domain name registrant names and addresses are incomplete or false, containing, for example, nonexistent street addresses or names of a large region instead of specific street addresses.[31]  In one instance, Defendants' identities are concealed by Defendants' use of a privacy protection service.[32]  Plaintiffs sought to verify the names and addresses in Defendants' domain name registrations but were unable to do so even after visiting the purported addresses overseas.[33]  Due to Defendants' deception and concealment, Plaintiffs are currently unaware of Defendants' true identities and locations.[34]

### 3.      Defendants' Actions Post-Filing

17.      Defendants have failed to respond to the Complaint or otherwise appear in this action.  Defendants have ceased operating the MovieTube Websites but continue to own and control the domains associated with those websites (the "MovieTube Domains").[35]

18.      Using the @MovieTubePW Twitter account, that on information and belief, is owned by Defendants, it was announced publicly that while Defendants were shutting down the MovieTube Websites, they would "try our hardest to bring #MovieTube back."[36]  At or around the time that Defendants ceased operating the MovieTube Websites, a temporary website was created at RIPMovieTube.cf, where this action was acknowledged in a post saying "[s]adly on

---

[30] *Id.* ¶ 25.
[31] *Id.* ¶¶ 26-27, Exs. F-G.
[32] *Id.* ¶ 27, Ex. G.
[33] *Id.* ¶ 27.
[34] *Id.* ¶ 28.
[35] True and correct screenshots from www.domaintools.com showing the most current WHOIS information for the MovieTube Domains are attached hereto as <u>Exhibit A</u>.
[36] <u>Exhibit B</u> (a true and correct screenshot of the @MovieTubePW Twitter account) at 59.

25/07/15 #MPAA sued #MovieTube over mass pricey [sic] and has closed down all #MovieTube links." The same post encouraged people to tweet using #MovieTube or #RIPMovieTube and to follow @MovieTubePW to "keep up to date on what is happening."[37]

19.   Recently, on September 15, 2015, the @MovieTubePW Twitter account, posted the following:[38]



20.   MovieTubenow.ws—though not identified in the Complaint—streams Infringing Copies of Plaintiffs' Works[39] and the selections are organized by curated and browsable categories and indexes of genres (*e.g.*, comedy, action, drama, etc.).[40] MovieTubenow.ws also appears to generate revenues through the display of digital advertisements served by advertising networks.[41] The domain, Movietubenow.ws—which is identically named to Defendants' MovieTube Domains MovieTubenow.com and MovieTubenow.in.—is registered, as are the MovieTube Websites, to an apparent false address, namely CHESTER at BD Palace Miami, Miami Thailand.[42] Finally, the MovieTubenow.ws domain is linked through common ownership to domains that are similarly titled to other of Defendants' websites—YouTubeOnFire.com,

---

[37] A true and correct a screenshot of the website at www.RIPMovieTube.cf is attached hereto as <u>Exhibit C</u>.
[38] <u>Exhibit B</u> at 7.
[39] Compl. ¶ 25; Alemi Decl. ¶ 6.
[40] Compl. ¶ 28; Alemi Decl.¶ 14.
[41] True and correct screenshots of relevant portions of the website located at www.MovieTubenow.ws are attached hereto as <u>Exhibit D</u>.
[42] A true and correct screenshots from www.domaintools.com, dated November 12, 2015, showing the most current Whois information for the MovieTubenow.ws domain, is attached hereto as <u>Exhibit E</u>.

YouTubeOnSale.com, YouTubeMainPage.com, YouTubeSoSexy.com and YouTubeOn.com[43]—

ordered to be transferred to Google by the administrative panel in an ICANN Policy arbitration

proceeding brought by Google against Defendants based upon a finding that Defendants had

registered and used the domains in bad faith (including for infringement of the YOUTUBE

trademark) (the "Google Administrative Proceeding").  Such similarly named domains linked to

MovieTubenow.ws include: youtube-on-fire.biz, youtube-on-fire.com, youtube-on-fire.net,

youtube-on-fire.ws, and youtubeonfire.in.

### 4.      Procedural Background

21.      On July 24, 2015, Plaintiffs commenced this action with the filing of a Complaint

alleging direct and secondary copyright infringement under the Copyright Act, 17 U.S.C. § 501,

*et seq.*; trademark infringement arising under Section 32 of the Lanham Act, 15 U.S.C.

§ 1114(1)(a); and unfair competition and false designation of origin arising under Section 43(a)

of the Lanham Act, 15 U.S.C. § 1125(a).[44]  On the same day as filing the Complaint, Plaintiffs

filed an Order to Show Cause for Preliminary Injunction (the "PI Motion") and submitted

supporting papers to the Court.  On July 29, 2015, Plaintiffs served Defaulting Defendants with a

copy of the Summons, Complaint, PI Motion, and supporting documents via email, the method

of service authorized by this Court by its Order dated July 24, 2015, Granting Leave to Serve

Process by Email.[45]  Plaintiffs withdrew the PI Motion on August 17, 2015[46] because Defendants

had ceased operating active websites at the domains.

22.      Defaulting Defendants have yet to answer, move, or otherwise plead with regard

to the Summons and Complaint, or appear in this action, and on August 21, 2015, the Clerk of

---

[43] Alemi Decl., ¶¶ 30, 32, Exs. H & J.
[44] A true and correct copy of the Complaint [Doc. No. 9] is attached hereto as <u>Exhibit F</u>.
[45] Affidavit of Service [Doc. No. 34], attached hereto as <u>Exhibit G</u>.
[46] Elings letter to Hon. Judge Crotty, dated Aug. 17, 2015 [Doc. No. 35].

the Court entered a default against Defaulting Defendants pursuant to Fed. R. Civ. P. 55(a).[47]

### III.   ARGUMENT

**A.      Jurisdiction**

23.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338(a) and (b); and 15 U.S.C. §§ 1116 and 1121.[48]

24.     Personal jurisdiction is proper over Defendants pursuant to New York C.P.L.R. §§ 302(a)(1), (a)(3)(i) and/or (a)(3)(ii) because the unlawful conduct complained of has caused injury to Plaintiffs within this District.  Defendants (i) regularly conducted, solicited, and/or transacted business in this District via their MovieTube Websites, and have solicited consumers in this District; (ii) advertised, promoted, marketed, publicly performed and distributed Infringing Copies to consumers within this District; (iii) derived substantial revenue in interstate and/or international commerce; and (iv) regularly and systematically directed electronic activity into the State of New York through their fully interactive MovieTube Websites with the intention, and for the purpose, of engaging in business within this District.[49]

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are entities or individuals subject to personal jurisdiction in this District and because, under 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to these claims arose and/or occurred in this District.[50]

**B.      Standard For Default Judgment**

26.     "When the adversary process has been halted because of an essentially unresponsive party, default judgment is appropriate to protect the non-defaulting party from interminable delay and continued uncertainty as to his rights."  *Sony Corp. v. S.W.I. Trading Inc.*,

---

[47] Clerk's Certificate of Default [Doc. No. 42], attached hereto as <u>Exhibit H</u>.
[48] Compl. ¶ 18.
[49] *Id.* ¶ 19.
[50] *Id.* ¶ 20.

104 F.R.D. 535, 540 (S.D.N.Y. 1985) (internal quotation marks omitted); *see also Citigroup Global Mkts., Inc. v. JWS 1999 Holding B.V.*, No. 08 Civ. 5362 (RJS), 2009 WL 2981912, at *1-2 (S.D.N.Y. Sep. 11, 2009); *Cadlerock Joint Venture, L.P. v. Prado*, No. 07 Civ. 1207 (JS) (WDW), 2008 WL 4561611, at *2 (E.D.N.Y. Oct. 7, 2008).

27.    Following a default, all factual allegations of the Complaint, except those pertaining to the amount of damages, must be accepted as true.  *See Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993); *Gucci America, Inc. v. MyReplicaHandbag.com*, No. 07 Civ. 2438 (JGK), 2008 WL 512789, at *1 (S.D.N.Y. Feb. 26, 2008) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).  In other words, a party's default is almost universally deemed an admission of the plaintiff's well-pled allegations of fact pertaining to liability.  *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006).

28.    "Additionally, although a plaintiff seeking to recover damages against a defaulting defendant must prove its claim through the submission of evidence, the Court need not hold a hearing as long as it has (i) determined the proper rule for calculating damages on the claim, and (ii) the plaintiff's evidence establishes, with reasonable certainty, the basis for the damages specified in the default judgment."  *Langenberg v. Sofair*, No. 03 Civ. 8339 (KMK) (FM), 2006 WL 3518197, at *1 (S.D.N.Y. Dec. 7, 2006) (internal citations omitted).

29.    Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment.  *See Columbia Pictures Indus., Inc. v. King*, No. 08-CV-4461, 2010 WL 1221457, at *1 (E.D.N.Y. Mar. 29, 2010).  First, under Fed. R. Civ. P. 55(a), the clerk must enter a notation of default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  The Clerk of the United States District Court for the Southern District of New York

entered a default against each Defendant on August 21, 2015.[51]  Second, upon obtaining a clerk's

notation of default, "a plaintiff must next seek a judgment by default under Rule 55(b)."  *New

York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005).  Even without the presumptions provided by

Defendants' default, Plaintiffs have shown that Defaulting Defendants are liable for direct and

secondary copyright infringement, trademark infringement, and unfair competition.

**C.**      **Defendants Are Liable For Copyright And Trademark Infringement**

    **1.**      **Direct Copyright Infringement**

    30.      To prove their direct copyright infringement claims Plaintiffs must establish: (1)

their ownership of valid copyrights; and (2) violation of at least one of Plaintiffs' exclusive rights

in those copyrights by Defendants.  *See* 17 U.S.C. § 501; *Feist Publ'ns, Inc. v. Rural Tel. Serv.

Co.*, 499 U.S. 340, 361 (1991); *Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d

Cir. 1985), *abrogated on other grounds by Salinger v. Colting*, 607 F.3d 68, 75, 82 (2d Cir.

2010).  Among the rights conferred by the Copyright Act on owners of copyrights in motion

pictures and other audio visual works, are the exclusive rights "to reproduce the copyrighted

work," "to distribute copies . . . of the copyrighted work to the public," "to perform the

copyrighted work publicly," and "to display the copyrighted work publicly." 17 U.S.C. § 106(1)

and (3)–(5).

    31.      Through their well-pled allegations in the Complaint, Plaintiffs have established

that they are the owners of valid copyrights and/or the relevant exclusive rights under United

States copyright laws in Plaintiffs' Works.[52]  Plaintiffs have established that Defendants have

infringed Plaintiffs' Copyrights by reproducing, distributing, publicly performing, and/or

---

[51] *See* Exhibit C hereto.
[52] Compl. ¶¶ 21-22, Ex. A.

DWT 28178396v6 0067328-000013

displaying Plaintiffs' Works, without authorization from Plaintiffs, in violation of 17 U.S.C. §§ 106(1) and (3)–(5) and 501.[53]

32.     Through their well-pled allegations in the Complaint, Plaintiffs have established that Defendants have infringed Plaintiffs' public performance right.[54]  Through the MovieTube Websites, Defendants aggregate, organize and provide extensive libraries of Infringing Copies of Plaintiffs' Works.  Users of the MovieTube Websites can stream these Infringing Copies using (i) video player software supplied by and built into the MovieTube Websites; and/or (ii) embedded viewing windows of third-party video players.[55]  *See Am. Broad. Cos., Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2510, 189 L. Ed. 2d 476 (2014) ("[T]he Transmit Clause expressly provides that an entity may perform publicly 'whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times.'"); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 277–78 (2d Cir. 2012) (finding that streaming copyrighted television works over the Internet constituted unlicensed public performances).

33.     The well-pled allegations of Plaintiffs' Complaint establish that Defendants have infringed Plaintiffs' rights to distribute copies of Plaintiffs' Works.[56]  Defendants, through the MovieTube Websites, allow users, in some instances, to download Infringing Copies by clicking on a selection from a menu built into the video player software supplied by Defendants.[57]  *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 122 (2d Cir. 2010); *Maverick Recording Co. v. Goldshteyn*, 2006 WL 2166870, at *3 (E.D.N.Y. July 31, 2006); *Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1203 (C.D. Cal. 2010) (finding that where defendant

---

[53] Compl. ¶¶ 24-25.
[54] Compl. ¶¶ 2, 35.
[55] Compl. ¶¶ 2, 35.
[56] Compl. ¶ 25.
[57] Compl. ¶¶ 2, 24, 25.

14

transmitted copies of copyrighted works "either as downloads or streams," it "distributed and publicly performed the Copyrighted Recordings" without authorization).

34.     Finally, the well-pled allegations of Plaintiffs' Complaint establish that Defendants have infringed Plaintiffs' exclusive rights to display the copyrighted work publicly under § 106(5) by providing clip previews online.[58]  Defendants market the Infringing Copies by displaying for each Infringing Copy of a television program or motion picture, its title, principal cast and director, plot synopsis, IMDB rating, promotional posters or "key art" and/or a playable preview video.[59]  *See Video Pipeline*, 192 F. Supp. 2d at 332 (citing 17 U.S.C. § 106(5)); *see also Getty Images (U.S.), Inc. v. Microsoft Corp.*, No. 14CV7114 DLC, 2014 WL 6633032, at *3 (S.D.N.Y. Nov. 24, 2014) (displaying copyrighted images on website can constitute infringement of public display right).

35.     Beyond the allegations in the Complaint, Plaintiffs have provided uncontested evidence of Defendants' direct infringement of at least 140 copyrighted works as listed in Exhibit A to the Complaint.[60]

## 2.     Secondary Copyright Infringement

36.     Defendants are also liable for infringement of Plaintiffs' Copyrights under the doctrines of contributory and vicarious copyright infringement.  To prove contributory copyright infringement, Plaintiffs must show that Defendants "with knowledge of the infringing activity . . . cause[d], or materially contribute[d] to the infringing conduct of" other parties. *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998).  To prove vicarious copyright infringement, Plaintiffs must show that Defendants: (i) have the right and ability to control the infringing conduct and (ii) derive a direct financial benefit from it.  *Gershwin Publ'g Corp. v.*

---

[58] Compl. ¶¶ 2, 28.
[59] Compl. ¶¶ 2, 28.
[60] Suh Decl. ¶¶ 4-5, Ex. A; Kaplan Decl. ¶¶ 5-6, Ex. A; Kim Decl. ¶ 4, Ex. A; Stanton Decl. ¶¶ 5-6, Ex. A; Garver Decl. ¶¶ 5-6, Ex. A; Reed Decl. ¶¶ 4-5, Ex. A.

DWT 28178396v6 0067328-000013

*Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *see also Broad. Music, Inc. v. JJ Squared Corp.*, No. 11-cv-5140 (JFB) (AKT), 2013 WL 6837186, at *6 (E.D.N.Y. Dec. 26, 2013).

37.     The well-pled allegations of Plaintiffs' Complaint establish each of these elements.[61]  The Complaint alleges Defendants' actual knowledge of the copyright infringement that was perpetrated through the MovieTube Websites.  Defendants openly acknowledged on their MovieTube Facebook page that the movies they streamed were "pirated movies."[62]  Moreover, Defendants' MovieTube Websites were rife with comments from users (i) asking about releases of different versions of the Infringing Copies and (ii) noting that some of Plaintiffs' Works being infringed are not yet legitimately released for home consumption, independently putting Defendants on notice of the infringement.[63]

38.     Finally, knowledge can by imputed based on the Google Administrative Proceeding.[64]  In that proceeding, Google argued—and the panel's decision recited—"that each website include[d] a copyright line on the bottom indicating that an entity named 'MovieTube' owns the copyright to the page" and "display[ed] identical pages all offering digital content, including movies, television shows, and music videos, many of which are presumed to be pirated copies of copyrighted products that Respondent is making available for illegal download or viewing."[65]

39.     Defendants materially contributed to other third-party infringement through the use of MovieTube Websites to catalog, promote, and link to Infringing Copies posted and/or hosted by third parties.  Defendants aggregated and provided links to Infringing Copies,

---

[61] Compl. ¶¶ 42-49.
[62] Compl., ¶ 4.
[63] Compl., ¶¶ 24-33; and 42-49.
[64] Alemi Decl., ¶¶ 30, 32, Exs. H & J.
[65] *Id.*

embedded viewing windows on the MovieTube Websites in which Infringing Copies stream, and marketed their offering of Infringing Copies both on the MovieTube Websites and through extensive use of social media.[66]  This constitutes material contribution to the third-party infringement of Plaintiffs' public performance rights.  *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1172 (9th Cir. 2007) ("[A]ssist[ing] a worldwide audience of users to access infringing materials" constitutes material contribution.); *Gershwin Publ'g*, 443 F.2d at 1163 (Defendant's "pervasive participation in the formation and direction of" the platform that performed the infringing works "amply support the district court's finding that it 'caused this copyright infringement.'" (citation omitted)).

40.     Defendants had the right and ability to control the MovieTube Websites.  The MovieTube Websites were "closed" websites in that they did not allow users to make additions or changes to the websites, and the content streamed through the websites could only be selected and provided by Defendants.[67]

41.     Defendants obtained a direct financial benefit from the infringement, including by successfully promoting the availability of Infringing Copies through Defendants' Social Media Accounts and other means to the point that the MovieTube Websites garnered many millions of visits each month from the United States alone, which geographically accounted for the most visits to each and every MovieTube Websites.[68]  Defendants derived revenue from the display of digital advertisements, which typically pay per impression or click-through and in turn provide revenue commensurate with site traffic.[69]

42.     Thus, Defendants contributorily and/or vicariously infringed, at a minimum, Plaintiffs' 140 copyrights.

---

[66] Compl. ¶ 25.
[67] Compl. ¶ 26.
[68] Compl., ¶¶ 28-30.
[69] *Id.*

DWT 28178396v6 0067328-000013

### 3.     Trademark Infringement

43.     To prove their claims for trademark infringement, Plaintiffs must show:  (1) the marks at issue are entitled to protection; (2) Defendants do not have consent to use the marks; (3) Defendants use the marks to distribute or advertise the Infringing Copies; and (4) Defendants' use of the marks is likely to cause confusion.  *See* 15 U.S.C. § 1114(1); *Otokoyama Co. v. Wine of Japan Import, Inc*., 175 F.3d 266, 270 (2d Cir. 1999).

44.     Plaintiffs' Marks are entitled to protection.  Through the well-pled allegations in the Complaint, Plaintiffs have established that they are the owners of the rights, titles and interests in and to their respective Marks in connection with the distribution of copies of Plaintiffs' Works—unauthorized copies of which Defendants are distributing using Plaintiffs' Marks.[70]

45.     Plaintiffs also have established that (i) Defendants used Plaintiffs' Marks; (ii) Defendants' use of Plaintiffs' Marks was not authorized by Plaintiffs, and (iii) the unauthorized copies of Plaintiffs' Works that Defendants were offering bore marks that were identical to or substantially indistinguishable from Plaintiffs' federally registered marks, which Plaintiffs are using in commerce.[71]  As to the element of likelihood of confusion, courts in this District have found that, "where [identical] marks are involved, it is not necessary to perform the step-by-step examination of each Polaroid factor" to find likelihood of confusion.  *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005) (internal quotation marks omitted); *see also Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010) (finding same).

46.     Moreover, the Second Circuit and courts in this and other districts have found

---

[70] Compl. ¶ 23, Ex. B.
[71] Compl. ¶¶ 44-45, 55-60.

DWT 28178396v6 0067328-000013

infringement where defendants have used a plaintiff's trademarks to distribute unauthorized goods, in part because the plaintiff is unable to control the quality of its goods.  As the Second Circuit opined: "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods [distributed] under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986); *see also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (defendant infringed Shell trademark by marketing bulk authentic Shell oil according to its own and not Shell's quality control standards); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, 816 F.2d 68, 75 (2d Cir. 1987) (Cardamone, J., concurring) (territorial restriction preventing United States sale of Cabbage Patch dolls with Spanish-language instructions is quality control measure; sale of dolls in United States infringes trademark); *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F. Supp. 131, 135-36 (D. Colo. 1980) (distribution of plaintiff's beer without regard to quality control standards is trademark infringement).  Moreover, under these authorities, a plaintiff may prevail irrespective of whether the goods actually deteriorated.  *See El Greco Leather Prods.*, 806 F.2d at 395 ("[T]he actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.").

47.    In evaluating trademark infringement claims based on the trademarks in motion pictures (and trademarks displayed on the face of photographs), courts have applied the relevant likelihood of confusion factors as they would in any trademark infringement claim.  *See Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 569-74 (D.N.J. 2003) (weighing likelihood of confusion factors and concluding use of studio marks in movie trailers edited by infringer constituted trademark infringement); *Playboy Enters., Inc. v. Frena*, 839 F. Supp. 1552, 1559-61 (M.D. Fla. 1993), *superseded by statute on other grounds as stated in ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 622 (4th Cir. 2001) (weighing likelihood of

confusion factors and concluding defendant's display of plaintiff's trademarks on unauthorized copies of plaintiff's photographs infringed trademarks).

48.     In the current matter, Plaintiffs have the right to control the quality of Plaintiffs' Works, including when and in what manner the works are distributed.[72]  Defendants distribute Infringing Copies of Plaintiffs' Works without regard to Plaintiffs' quality controls and user comments complaining about quality (including of Infringing Copies made by taking a video of a theatrical performance) were rampant on the MovieTube Websites.[73]

**D.     Plaintiffs Are Entitled To Statutory Damages For Defendants' Willful Infringement**

    **1.     Statutory Damages For Willful Copyright Infringement**

49.     Plaintiffs may elect to recover statutory damages for Defaulting Defendants' willful copyright infringement under the Copyright Act.  In cases of willful infringement, 17 U.S.C. § 504(c) provides for an award of statutory damages of up to $150,000 "for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally."

50.     Under the Copyright Act, enhanced statutory damages are intended to compensate a plaintiff who has been harmed by a willful infringer and to deter future willful infringement. *See Peer Int'l Corp. v. Luna Records, Inc.*, 887 F. Supp. 560, 568 (S.D.N.Y. 1995).  Statutory damages serve as an important deterrent, and "the court must award an amount that will put the defendant on notice that it costs more to violate the copyright law than to obey it."  *Stevens v. Aeonian Press, Inc.*, 2002 WL 31387224, at *1 (S.D.N.Y. Oct. 23, 20002) (citation omitted).

51.     Courts consequently have wide latitude in determining the amount of statutory damages in a particular case.  In similar actions, Courts in this district have granted other plaintiffs large statutory damages including up to the maximum statutory amount for willful

---

[72] Suh Decl. ¶ 5; Kaplan Decl. ¶ 6; Kim Decl. ¶ 4; Stanton Decl. ¶ 6; Garver Decl. ¶ 6; Reed Decl. ¶ 5.
[73] Alemi Decl. ¶ 20.

DWT 28178396v6 0067328-000013

copyright infringement.  *See, e.g.*, *U2 Home Entm't, Inc. v. Wei Ping Yuan*, 245 F. App'x 28, 29 (2d Cir. 2007) (affirming award of maximum statutory damages of over $7 million for each of 47 infringed motion picture works); *Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d at 475-86 (S.D.N.Y. 2001) (awarding maximum statutory damages of $1,800,000 on 18 infringed telecasts); *Hounddog Prods., L.L.C. v. Empire Film Grp., Inc.*, 826 F. Supp. 2d 619, 631-32 (S.D.N.Y. 2011) (awarding maximum statutory damages on one infringed work); *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1195 (9th Cir. 2001) (affirming award of $31.68 million in maximum statutory damages for infringement of copyrights in television episodes); *Peer Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336-37 (9th Cir. 1990) (affirming award of maximum statutory damages); *Louis Vuitton Malletier, SA v. Akanoc Solutions, Inc.*, 658 F.3d 936, 946-47 (9th Cir. 2011) (same); *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 511-12 (E.D. Va. 2003) (entering default judgment and awarding maximum statutory damages for each of 22 infringed works).

52.     The factors considered by courts to determine the amount of statutory damages in copyright infringement cases include:  (i) expenses saved and profits reaped by defendant; (ii) revenues lost by plaintiff; (iii) value of the copyright; (iv) deterrent effect on other infringers, besides the defendant; (v) whether the defendant's conduct was innocent or willful; (vi) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (vii) the potential for deterring the defendant.  *See Fitzgerald Publ'g Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986).  The Copyright Act gives "wide discretion" in applying these factors to set an award of statutory damages. *Id.* at 1116. Application of these factors supports a substantial award here.

a.     **Defendants' Willfulness**

53.     There can be no question that Defaulting Defendants' reproduction, distribution, public performance and display of Plaintiffs' copyrighted works, and their offer for sale and sale of Infringing Products, were willful.  Willfulness in this context "means that the infringer either had actual knowledge that it was infringing the plaintiffs' copyrights or else acted in reckless disregard of the high probability that it was infringing plaintiffs' copyrights." *Nat'l Football League*, 131 F. Supp. 2d at 475-86 (awarding $2,557,500 in statutory damages for willful copyright infringement).  Knowledge "need not be proven directly but may be inferred from the defendant's conduct," *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992), and where a defendant has defaulted, the Court may infer willfulness on that ground alone, *see Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, No. 14-CV-7346 KBF, 2015 WL 1508497, at *5 (S.D.N.Y. Apr. 1, 2015) ("Copyright infringement is deemed willful by virtue of a defendant's default."); *Hounddog Prods.*, 826 F. Supp. 2d at 631-32 (inferring willfulness from default and awarding maximum statutory damages on default judgment for willful copyright infringement).

54.     Plaintiffs have shown that Defaulting Defendants have willfully engaged in the performance, display, and reproduction of Plaintiffs' copyrighted Works.  Defendants' knowledge of infringement is undeniable for all of the reasons enumerated in paragraphs 12, 37-41, *supra*.

55.     Willful infringement is also independently presumed where the infringer provides false contact information for a domain name used in connection with the infringement.  *See* 17 U.S.C. § 504(c)(3)(A) ("[I]t shall be a rebuttable presumption that the infringement was committed willfully for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially

22

false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the infringement."). This presumption applies strongly here. Defendants' WHOIS registrant names and addresses are incomplete or false, containing, for example, nonexistent street addresses or names of a large region instead of specific street addresses.[74] In other instances, Defendants' listed names and addresses are concealed by Defendants' use of a privacy protection service.[75] Plaintiffs sought to verify the names and addresses in Defendants' domain name registrations but were unable to do so even after visiting the purported addresses overseas.[76] Due to Defendants' deception and concealment, Plaintiffs are currently unaware of Defendants' true identities and locations.[77]

### b. Deterrent Effect On Other Infringers

56. Statutory damages serve an important deterrent purpose, and "the court must award an amount that will put the defendant on notice that it costs more to violate the copyright law than to obey it." *Stevens*, 2002 WL 31387224, at *1 (citation omitted). Thus, defendants must be prevented from "sneering" in the face of the copyright laws. *N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc.*, No. 89 Civ. 6082RWS (KAR), 1991 WL 113283, at *4 (S.D.N.Y. June 14, 1991), *aff'd*, 954 F.2d 847 (2d Cir. 1992).

57. Defendants' illegal enterprise was apparently enormously profitable. The MovieTube Websites received over 81 million visits in the month prior to their disabling, and Defendants were monetizing this massive amount of Internet traffic through paid advertisements through five different advertising networks. This is the exact sort of large scale enterprise that courts must deter through large statutory damages awards. As a court in this Circuit stated: "It

---

[74] *Id.* ¶¶ 26-27, Exs. F-G.
[75] *Id.* ¶ 27, Ex. G.
[76] *Id.* ¶ 27.
[77] *Id.* ¶ 28.

DWT 28178396v6 0067328-000013

is an unfortunate irony that the progression of technology diminishes our ability to safeguard the intellectual property that is the lifeblood of further technological progress.  Defendants' misuse of technology to pirate Plaintiffs' product was an egregious and willful act designed to 'sneer' in the face of Plaintiffs' copyright and intellectual property laws. An award of the enhanced statutory maximum is appropriate and reasonable to compensate Plaintiffs and to deter Defendants and future infringers."  *Aldelo Sys., Inc. v. TAD Sys. Tech. Inc.*, No. 08-CV-3822 (SLT) (RM), 2009 WL 2905780, at *6 (E.D.N.Y. Sept. 10, 2009).

     **c.**    **Cooperation In Providing Records**

     58.    By their failure to appear, Defaulting Defendants have also denied Plaintiffs their entitlement to discovery of vital information such as the amount of their sales, the identity of their suppliers, and their affiliation with other infringers of Plaintiffs' goods, preventing meaningful investigation of Defaulting Defendants' activities and those of their potentially larger-scale sources.  "The award of statutory damages is particularly appropriate in the default judgment context where plaintiff is without the benefit of any disclosure by the defendant, leaving damages uncertain."  *Rolex Watch, U.S.A., Inc. v. Pharel*, No. 09 CV 4810 (RRM) (ALC), 2011 WL 1131401, at *4 (E.D.N.Y. Mar. 11, 2011).  Defaulting Defendants have doubly harmed Plaintiffs: first by performing, displaying, and reproducing their content on a massive scale and without authorization and second by cutting off their ability to investigate that activity and pursue their larger enforcement programs.  For example, Plaintiffs were never able to determine Defendants' actual identities or the identities of those who uploaded video files streamed through Defendants' MovieTube Websites.  Without this information, Plaintiffs cannot further their investigation of these very likely continuing harms (e.g., by the streaming of the same media files and other media files uploaded by the same persons through different websites).

This leaves Plaintiffs with no practical choice but to seek a substantial award of statutory damages.

### d.    Value Of The Copyrights

59.    Plaintiffs' audiovisual works represent some of the most popular and successful films and television programs in the history of popular entertainment.[78]  Plaintiffs have engaged in extensive and sophisticated marketing of their Works.[79]  The value of these works is inestimable, and Defaulting Defendants' infringing activities divert legitimate exploitation of Plaintiffs' Works and deprive Plaintiffs the right and ability to control when, where and how Plaintiffs' Works are distributed, displayed, reproduced and performed.

### e.    Profits Reaped by Defendants

60.    The number of visits to the MovieTube Websites—over 81 million in one recent month alone, including almost 61 million visits from the United States—shows that Defaulting Defendants receive significant amounts of revenue, at least $81,000 to $243,000 in one recent month from just one advertising network.  Without any data from Defaulting Defendants, it is impossible to know how many impressions Defendants actually receive (rather than third-party estimates), how many click-throughs Defendants' advertisements receive (another metric used by advertisers to pay publishers), and how much revenue Defendants have made beyond a monthly probable floor.  In light of these gaps in information, wholly caused by Defaulting Defendants' failure to appear and provide discovery, the Court is entitled to assume significant profits reaped by Defaulting Defendants and to place heavy emphasis on the willfulness and deterrence factors.  *See Rovio Entm't, Ltd. v. Allstar Vending, Inc.*, 97 F. Supp. 3d 536 (S.D.N.Y. 2015) (awarding $100,000 per copyrighted work infringed in light of defendants' default); *Rogers v. Ecolor Studio*, No. 11-CV-4493, 2013 WL 752256, at *7 (E.D.N.Y. Feb. 7, 2013),

---

[78] Compl. ¶¶ 21, 45; Kaplan Decl. ¶ 4; Kim Decl. ¶ 4; Stanton Decl. ¶ 4; Garver Decl. ¶ 4; Reed Decl. ¶ 4.
[79] Compl. ¶¶ 27-31; Kaplan Decl. ¶ 9; Kim Decl. ¶ 9; Stanton Decl. ¶ 9; Garver Decl. ¶ 9; Reed Decl. ¶ 9.

*report and recommendation adopted*, No. 11-CV-4493 ARR RER, 2013 WL 750120 (E.D.N.Y. Feb. 27, 2013) (Where there was no record of Defendants' profits "due to Defendants' default and failure to participate in pretrial discovery," "the Court's statutory damages determination [wa]s informed significantly by the imperatives of penalizing Defendants' willful infringement and deterring other potential infringers."); *Lyons P'ship, L.P. v. AAA Entm't Inc.*, No. 98CIV.0475DABMHD, 1999 WL 1095608, at *6 (S.D.N.Y. Dec. 3, 1999) ("[B]y virtue of their infringement and their default in this case, these defendants have made it difficult or impossible for plaintiff to develop a detailed record of the amount of the infringers' revenues derived from the infringing use of the Barney costumes. Of necessity, then, ambiguities in the record must be read against the defendants.").

### 2. Damages Sought In This Case

61.     Defaulting Defendants have copied and distributed thousands of Plaintiffs' copyrighted works.[80]  In their submissions in this action, Plaintiffs have enumerated 140 registered copyrights in motion picture and television works that Defendants have infringed as follows:[81]

| Plaintiff | Registered Works |
|---|---|
| Paramount | 15 |
| WBEI | 36 |
| Fox | 34 |
| CPII | 11 |
| Universal | 23 |
| DEI | 21 |
| **Total** | **140** |

---

[80] Under Second Circuit law, for television series, each individual episode is treated as a work for the purposes of calculating statutory damages, even where the infringer sells multiple episodes in one product.  "Plaintiff is entitled to recover statutory damages for each episode of its television programs that was unlawfully distributed . . . ."  *U2 Home Entm't, Inc. v. Fu Shun Wang*, 482 F. Supp. 2d 314, 319 n.5 (E.D.N.Y. 2007) (citing *U2 Home Entm't, Inc. v. John Does I Through V*, No. 04 CV 4402 RJDMA, 2005 WL 3018702, at *4 (E.D.N.Y. Sept. 13, 2005) (citing *Twin Peaks Prods., Inc. v. Pub'ns Int'l, Ltd.*, 996 F.2d 1366, 1381 (2d Cir. 1993)).

[81] Compl. ¶ 22, Ex. A; Suh Decl. Ex. A; Kaplan Decl. Ex. A; Kim Decl. Ex. A; Stanton Decl. Ex. A; Garver Decl. Ex. A; Reed Decl. Ex. A.

DWT 28178396v6 0067328-000013

62.     Based on the above discussed aggravating factors—including the manifest willfulness of Defendants' conduct in running a massive online piracy network with an audience of tens of millions around the world—the Court would be entitled to award the maximum statutory damages of $150,000 per infringed work for Defaulting Defendants' willful infringement of Plaintiffs' copyrights as authorized by 17 U.S. Code § 504(c).  Based on the enumerated 140 copyrights, this would result in an award of statutory damages of $21,000,000 (twenty-one million dollars).

63.     While Plaintiffs are entitled to seek this amount under the statute, Plaintiffs instead seek one-half this amount, or $75,000 per infringed work, for a total recovery of $10,500,000 in statutory damages for copyright infringement.  Similarly, while Plaintiffs are entitled to seek damages on all works offered for sale[82] as well as attorneys' fees and costs,[83] Plaintiffs are not seeking damages for the other infringed works, or Plaintiffs' attorneys' fees and costs.[84] No part of the judgment sought has been paid.

**E.      Plaintiffs Are Entitled To A Permanent Injunction**

64.     In addition to the foregoing relief, Plaintiffs respectfully request entry of a permanent injunction enjoining Defaulting Defendants from infringing or otherwise violating Plaintiffs' copyrights and other rights in Plaintiffs' Works and from infringing or otherwise

---

[82] 17 U.S.C. § 504(c) (plaintiff entitled to seek damages for "all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally "); *see also WB Music Corp. v. RTV Commc'n Grp., Inc.*, 445 F.3d 538, 540 (2d Cir. 2006) ("the total number of awards of statutory damages that a plaintiff may recover in any given action depends on the number of works that are infringed and the number of individually liable infringers, regardless of the number of infringements of those works") (citation omitted)).

[83] Under the Copyright Act, reasonable costs, including attorneys' fees, may be awarded to the prevailing party. 17 U.S.C. § 505; *see also Fogerty v. Fantasy, Inc.*, 510 US 517, 534-35 (1994).

[84] Additionally, although Plaintiffs have asserted additional claims in the Complaint for trademark infringement pursuant to 15 U.S.C. § 1114 and unfair competition pursuant to 15 U.S.C. §1125(a), and are entitled to seek damages thereunder, Plaintiffs seek damages on default only for direct and secondary copyright infringement claims under the Copyright Act.

DWT 28178396v6 0067328-000013

violating Plaintiffs' rights in Plaintiffs' Marks.  A court may "issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction." *Lyons P'ship, L.P. v. D&L Amusement & Entm't, Inc.*, 702 F. Supp. 2d 104, 118 (E.D.N.Y. 2010); *see also Pitbull Prods., Inc. v. Universal Netmedia, Inc.*, No. 07 Civ. 1784 (RMB) (GWG), 2007 WL 3287368, at *5 (S.D.N.Y. Nov. 7, 2007) (quoting *Kingvision PayPerView Ltd. v. Lalaleo*, 429 F. Supp. 2d 506, 516 (E.D.N.Y. 2006)); *La Barbera v. Les Sub-Surface Plumbing, Inc.*, No. 06 CV 3343 (NG) (KAM), 2008 WL 906695, at *10 (E.D.N.Y. Apr. 3, 2008).

65.     To obtain a permanent injunction, a plaintiff must show: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *accord Rovio Entm't*, 2015 WL 1508497, at *6; *Laboratorios Rivas, SRL v. Ugly & Beauty, Inc.*, No. 11 Civ. 5980 (RA) (JLC), 2013 WL 5977440, at *11 & n.11 (S.D.N.Y. Nov.12, 2013); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Kun Fung USA Trading Co.*, 2012 WL 1414872, at *5 (E.D.N.Y. Jan. 20, 2012); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 & n.16 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013); *see also Salinger*, 607 F.3d at 77-78 n.7 (suggesting that the standard articulated by the Supreme Court in *eBay Inc. v. MercExchange* applies to all applications for injunctions).

66.     Here, the first requirement is met inasmuch as the Copyright Act expressly provides that a federal court has the power to issue "final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright" (17 U.S.C. § 502(a)).  The

DWT 28178396v6 0067328-000013

Lanham Act similarly provides that a federal court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). As to the requirements for a permanent injunction, the *eBay* factors weigh in favor of issuing the requested injunction.

1. **Defendants Have Suffered An Irreparable Injury For Which Monetary Damages Are Inadequate To Compensate**

67. The Second Circuit in *Salinger v. Colting* recognized that while courts must not simply presume irreparable harm in copyright cases, "[t]his is not to say that most copyright plaintiffs who have shown a likelihood of success on the merits would not be irreparably harmed absent [] injunctive relief," and that "[a]s an empirical matter, that may well be the case, and the historical tendency to issue [] injunctions readily in copyright cases may reflect just that." 607 F.3d at 82. Furthermore, "courts have tended to issue injunctions in this context because 'to prove the loss of sales due to infringement is . . . notoriously difficult.'" *Id.* at 81 (quoting *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)). Consequently, irreparable harm has been readily found in copyright infringement cases. *See, e.g.*, *WPIX, Inc.*, 691 F.3d at 285–87 (affirming finding of irreparable harm by Internet streaming of copyrighted television programming because (i) that streaming would substantially diminish the value of that programming—such as from advertising revenue and by disturbing licensing relationships and distribution windows, (ii) the plaintiffs' losses would have been difficult to measure and monetary damages insufficient to remedy the harms, and (iii) the defendant would have been unable to pay damages should the plaintiffs prevail). *Salinger* concerned a preliminary injunction, but courts in this Circuit have said much the same about permanent injunctions. *See, e.g.*, *Disney Enters., Inc. v. Merchant*, No. 6:05-CV-1489, 2007 WL 1101110, at *6 (N.D.N.Y. Apr. 10, 2007) ("Permanent injunctions are routinely awarded in favor of

copyright owners whose protected works have been misappropriated in order to serve the public's interest in upholding copyright protections.").  Courts in this Circuit have extended the *Salinger* "rule" to trademark cases, ending a presumption of irreparable harm but finding that irreparable harm can easily be established by demonstrating that the trademark owner's goodwill and reputation are in peril.  For example, in granting a permanent injunction, without presuming irreparable harm, the court in *United States Polo Association, Inc. v. PRL USA Holdings, Inc.* found that the proven likelihood of confusion means that "the reputation and goodwill cultivated by [the plaintiff] would be out of its hands . . . [T]he impression given to consumers by the [defendant's] product, and so the reputation and goodwill of the [plaintiff's] will not be in [plaintiff's] control."  800 F. Supp. 2d at 541.

68.    While Defendants in this Action appear to have ceased their infringing conduct at least with respect to the MovieTube Websites, their past behavior, and their suggestions that they could easily resume their infringing conduct indicate that Defendants "might continue to engage in infringing activities . . . unless enjoined by the Court, demonstrating the danger that monetary damages will fail to fully provide [Plaintiffs] with relief[.]"  *Rovio Entm't*, 2015 WL 1508497, at *7; *see also Laboratorios Rivas*, 2013 WL 5977440, at *11 ("The second *eBay* factor, no adequate remedy at law, is satisfied where the record contains no assurance against defendant's continued violation of Plaintiff's trademark," and "[w]here default is entered, [a] court may infer from a defendant's default that it is willing to, or may continue its infringement.") (internal quotation marks omitted).  An injunction is needed to "ensure that the misconduct does not recur as soon as the case ends."  *BMG Music v. Gonzalez*, 430 F.3d 888, 893 (7th Cir. 2005) (grant of permanent injunction affirmed despite defendant's contention that it "should be vacated because she has learned her lesson, has dropped her broadband access to the Internet, and is unlikely to download copyrighted material again"); *see also Sony Pictures Home Entm't Inc. v. Lott*, 471 F.

Supp. 2d 716, 723 (N.D. Tex. 2007) (stating, "In cases involving unlawful downloading of electronic files, courts often issue permanent injunctions to 'ensure that the misconduct does not recur as soon as the case ends.'") (citation omitted; collecting cases).  Defendants' default also threatens resumption of irreparable harm and justifies imposition of a permanent injunction.  *See Sony Pictures Home Entm't Inc. v. Chetney*, No. 5:06-cv-227 (FJS/GJD), 2007 WL 655772, at *4 (N.D.N.Y. Feb. 26, 2007) ("Since, by reason of her default, Defendant has admitted that she willfully infringed Plaintiffs' copyrights and there is nothing in the record to suggest that Defendant would not continue to violate Plaintiffs' copyrights, the Court grants Plaintiffs' request for a permanent injunction that encompasses both their present and their future copyrighted motion pictures."); *Jackson v. Sturkie*, 255 F. Supp. 2d 1096, 1103 (N.D. Cal. 2003) (reasoning in issuing permanent injunction, "The defendant's past behavior and on-going ability to infringe plaintiff's copyright constitute a continued threat of future infringing activity. Defendant amply possesses the means for future infringement . . . .  In addition, defendant's lack of participation in this litigation has given the court no assurance that defendant's infringing activity will cease."

  69. At the time Defendants were operating the MovieTube Websites, they did so knowing their activities were illegal.[85]  As discussed at paragraph 18, Defendants have stated an intention that they may resume the infringing conduct on the MovieTube Websites.  Defendants also continue to own the MovieTube Domains and Defendants have a history of warehousing domain names for the purpose of evading the copyright laws, specifically stating on their Facebook page that "[i]n case MovieTube is blocked by your broadband provider, we will release a new domain every month."[86]  More recently, the @MovieTubePW Twitter account

---

[85] *See* discussion at ¶¶ 12, 34; and Alemi Decl. ¶ 31, Ex. I.
[86] Alemi Decl. Ex. C at 1-2.

DWT 28178396v6 0067328-000013

associated with Defendants began directing viewers to the website located at MovieTubenow.ws, which streams Infringing Copies of Plaintiffs' Works.

70.     As such, Defendants' past behavior and on-going ability to infringe Plaintiffs' Copyrights and Plaintiffs' Marks constitute a continued threat of future infringing activity. Defendants amply possess the means for future infringement and Defendants' lack of participation in this litigation cannot provide this Court with assurances that Defendants will cease infringing Plaintiffs' Copyrights and Marks.

### 2.     The Balance of Hardships and Public Interest Favor an Injunction

71.     As explained above, the harm to Plaintiffs is irreparable. On the other hand, issuing a permanent injunction requiring Defendants to cease infringing Plaintiffs' copyrights will not harm Defendants in this case because, as an initial matter, the websites at issue are already down.  Moreover, Defendants have no legitimate interest in distributing Infringing Copies, and, given "the probable outcome of this action, this is a loss which [Defendants] may justifiably be called upon to bear." *Corning Glass Works v. Jeannette Glass Co*., 308 F. Supp. 1321, 1328 (S.D.N.Y.), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

72.     Furthermore the public interest undoubtedly favors an injunction.  The "public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating television programming." *WPIX Inc.*, 691 F.3d at 287. Inadequate protections for copyright owners "can threaten the very store of knowledge to be accessed; encouraging the production of creative work thus ultimately serves the public's interest in promoting the accessibility of such works." *Id.* (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 961 (2005)).  "Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections . . . ." *Apple Computer,*

32

*Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3d Cir. 1983).  Additionally, the "public

has an interest in not being deceived—in being assured that the mark it associates with a product

is not attached to goods of unknown origin and quality."  *N.Y.C. Triathlon, LLC v. NYC*

*Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010).

### 3.        This Court Has Authority To Order The Transfer of Domains

73.        Given the breadth of the Defendants' intentional infringement, which was

orchestrated from outside the United States, Defendants' anonymity perpetuated by their use of

false WHOIS information and failure to appear in Court, and Defendants' exclusive operation

over the Internet and reliance on domain name registries and advertising networks to carry out

their activities, the Court should order that: (i) registries and registrars disable the domains to the

MovieTube Websites and (ii) advertising service providers cease providing services to the

MovieTube Websites and Defendants in relation to the Infringing Copies.

74.        This Court's power to order the transfer of domain names is well established.  For

example, building on prior precedent, the court in *North Face Apparel Corp. and PRL USA*

*Holdings, Inc. v. Fujian Sharing Import & Export Ltd. Co.*, No. 10-CIV-1630 (S.D.N.Y. Mar. 1,

2010), ordered the freeze (as part of the preliminary injunction) and eventual transfer (as part of

the final injunction and judgement), *en masse*, of domains connected to websites selling or

formerly selling counterfeit goods. The authority for this relief was based on: (i) the fact that the

domain names were used as tools facilitating the infringement (i.e., a method for promoting,

offering for sale, selling and distributed the infringing product); (ii) 15 U.S.C. § 1116 of the

Lanham Act ("courts . . . shall have power to grant injunctions, according to the principles of

equity and upon such terms as the court may deem reasonable, to prevent the violation of" a

trademark); (iii) Rule 65 and; (iv) the court's equitable powers.  *Id.*[87]

75.     In addition to *Fujian*, multiple court orders in at least three jurisdictions involving trademark infringement and copyright infringement have issued directing the transfer of domains following a defendant's default.  *See, e.g.*, Default Judgment and Permanent Injunction Order [Doc. No. 27], *Warner Bros. Entm't, Inc. v. Doe*, No. 14-cv-3492 (S.D.N.Y. Oct. 3, 2014) (trademark and copyright action); Order [Doc. No. 21], *AACS v. Shen*, No. 14-cv-1112 (S.D.N.Y. Mar. 4, 2014) (granting preliminary injunction order in DMCA anti-circumvention action); *Dish Network LLC v. Dillon*, No. 12CV157 (BMT (NLS), 2012 WL 368214, at *1 (S.D. Cal. Feb. 3, 2012) (granting preliminary injunction order in DMCA anti-circumvention action); Default Judgment and Permanent Injunction Order [Doc. No. 34], *Belstaff Grp. SA v. Doe*, No. 15-cv-2242 (S.D.N.Y. June 18, 2015); Temporary Restraining Order [Doc. No. 12], *Richemont Int'l SA v. Xiao*, No. 13-cv-9071 (S.D.N.Y. Dec. 23, 2013); Temporary Restraining Order [Doc. No. 16], *Richemont Int'l SA v. Chen*, No. 12-cv-6689 (S.D.N.Y. Sept. 4, 2012); Temporary Restraining Order [Doc. No. 7], *The Nat'l Football League v. Chen*, No. 11-cv-0344 (WHP) (S.D.N.Y. Jan. 19, 2011); Temporary Restraining Order [Doc. No. 7], *True Religion Apparel, Inc. v. Lei*, No. 11-cv-8242 (S.D.N.Y. Nov. 17, 2011); Preliminary Injunction Order [Doc. No. 5] *Tory Burch LLC v, Yong Sheng Int'l Trade Co., Ltd*, No. 10-Civ-9366 (S.D.N.Y. Dec. 17, 2010); Temporary Restraining Order [Doc. No. 11], *PRL USA Holdings, Inc. v. Kiat*, No. 10-Civ-6456 (PGG) (S.D.N.Y. Sept. 1, 2010).  *See also Datatech Enters. LLC v. FF Magnat Ltd.*, No. C12-4500 (CRB), 2012 WL 4068624 (N.D. Cal. Sept. 14, 2012) (granting preliminary injunction order in copyright action); Order [Doc.  No. 11], *Liberty Media Holdings v. FF Magnet Ltd.*, 12-

---

[87] Temporary Restraining Order, Seizure Order, Asset Restraining Order, Domain Name Transfer Order and Order to Show Cause for Preliminary Injunction [Doc. No. 15], *North Face Apparel Corp. v. Fujian Sharing Import & Export Ltd.*, No. 10-civ-1630, at 1-4 (S.D.N.Y. Mar. 2, 2010).  *See also* Order [Doc. No. 56], *North Face Apparel Corp. v. Fujian Sharing Import & Export Ltd.*, No. 10-civ-1630, at 5 (S.D.N.Y. June 24, 2011) (confirming that a domain name registry could be subject to an injunction to cease services to defendants' domains).

cv-1057 (D. Nev. June 21, 2012) (TRO in copyright action); Temporary Restraining Order [Doc. No. 13], *Farouk Sys., Inc. v. EYOU Int'l Trading Co., Ltd.*, No. 4:10-Civ-2672 (S.D. Tex.  Aug. 2, 2010).

76.     Even where websites are no longer actively operating and infringing, it is appropriate to order transfer of domain names to prevent recurrence of infringement, as the discontinuance of infringement "does not guarantee that Defendant will not return to its old ways once this case is resolved."  *Bittorrent, Inc. v. Bittorrent Mktg. GMBH*, No. 12-CV-02525, 2014 WL 5773197, at *13 (N.D. Cal. Nov. 5, 2014) (Court ordered transfer of domains despite redirection of the subject domain names to a website that was "passive" and no longer contained infringing content, stating "[t]hat the [domain names] now resolve to 'bittorrent.eu,' a passive site, does not guarantee that Defendant will not return to its old ways once this case is resolved . . . although the [domain names] evidently now resolve to 'bittorrent.eu,' which posts updates on the status of this lawsuit, Plaintiff has sufficiently alleged Defendant's liability for past infringing uses of the BitTorrent Marks.").  Although the MovieTube domains do not themselves infringe Plaintiffs' rights, Defendants built up significant goodwill in the MovieTube brand through the infringement of Plaintiffs' rights.  As such, Defendants have no legitimate interest in the MovieTube Domains where the goodwill in that brand was built on infringing activity.

77.     Moreover, given Defendants' default and claims that they may reconstitute the infringing MovieTube Websites, Plaintiffs' requested injunctive relief is necessary to prevent irreparable harm to Plaintiffs should the domains be left in Defendants' control.  Defendants possess the means for, and have indicated their willingness to resume, future infringement.  The @MovieTubePW Twitter account, which was associated with the MovieTube Domains, now

refers users and contains links to MovieTubenow.ws, which streams Infringing Copies of

Plaintiffs' Works.[88]  In addition, Defendants' lack of participation through default (and their

choice to thus remain anonymous) does not provide Plaintiffs or the court any assurance the

Defendants would abide by any order of this Court.  As such, this relief is necessary to prevent

Defendants from instantly and at any time reversing their self-imposed disabling of the

MovieTube Websites, as they have threatened to do through social media accounts and website

statements.[89]

**F.     Plaintiffs Are Entitled To Ongoing Discovery**

78.     A court's authority to order post-judgment discovery is broad so long as it is

relevant to or in aid of satisfying a judgment.  *See* Fed. R. Civ. P. 69(a)(2) and N.Y.C.P.L.R. §

5223.  It is well-recognized that "broad post-judgment discovery in aid of execution is the norm

in federal and New York state courts."  *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 207–08

(2d Cir. 2012), *aff'd sub nom. Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250

(2014). "The scope of discovery under Rule 69(a)(2) is constrained principally in that it must be

calculated to assist in collecting on a judgment."  *Id.* at 207.

---

[88] MovieTubenow.ws cannot be formally linked to Defendants based on present publicly available information; this is in large part due to Defendants' use of false identities to carry out their infringing activities.
[89] *See* ¶¶ 18, 69, *supra*.

DWT 28178396v6 0067328-000013

79.     Nonparties who have conducted business with Defendants, including but not limited to domain privacy services, advertising services or social media accounts, are likely to have identifying information concerning the name and location of Defendants or their business or financial information, all of which could aid in satisfying a judgement.  As such, Plaintiffs are entitled to post-judgment discovery.

_____
G. Roxanne Elings

Sworn to and subscribed before me,
this /2 day of November, 2015

_____
Notary Public

SONIA NIEVES
NOTARY PUBLIC STATE OF NEW YORK
BRONX COUNTY
LIC. #01NI6260688
COMM. EXP.____4/30/2016